IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation,   :
               Petitioner   :
                              :   No. 462 M.D. 2013
                              :
          v.   :
                              :   Argued: June 17, 2015
City of Lancaster and Pennsylvania   :
Public Utility Commission,   :
               Respondents   :


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
              HONORABLE BERNARD L. McGINLEY, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge


OPINION BY
JUDGE McCULLOUGH               FILED: October 15, 2015


Presently before this Court is the application of PPL Electric Utilities Corporation (PPL) for summary relief seeking a judgment in its favor with respect to counts I, II, III, and V of its amended petition for review, specifically, a declaration that several provisions of Administrative Ordinance No. 16-2013 (the Ordinance) enacted by the City of Lancaster (City) are invalid and preempted by the Public Utility Code (Code), 66 Pa.C.S. §§101-3316, and an order enjoining enforcement of these provisions.

## I. Facts and Procedural History

The underlying facts of this case are not in dispute. PPL is a public utility, regulated by the Pennsylvania Public Utility Commission (PUC). PPL

provides electric service to the public pursuant to a PUC-approved tariff. Under its tariff, PPL's service territory covers 29 counties and 653 municipalities, including the City. On May 28, 2013, the City enacted Administrative Ordinance No. 2-2013 for the purpose of implementing a comprehensive program for management of the City's rights-of-way, including management of public utilities and public utility facilities within these rights-of-way. The City also adopted, on this same day, a resolution which set forth a fee schedule related to activities and uses in the public rights-of-way.[1] On September 17, 2013, PPL filed a petition for review in the nature of a complaint in this Court's original jurisdiction seeking declaratory and injunctive relief. PPL joined the PUC as an additional defendant.

## II. December 17, 2013 Ordinance

On December 17, 2013, the City enacted the Ordinance at issue, which repealed the previously enacted Administrative Ordinance No. 2-2013[2] and implemented another program for management of the City's rights-of-way, again including management of public utilities and public utility facilities within these rights-of-way. The City relied on the powers granted to it under the Third Class City Code (TCCC)[3] and the Home Rule Charter and Optional Plans Law[4] in enacting the Ordinance.[5]

---

[1] This fee schedule sets forth, *inter alia*, a five-year use permit fee, curb and sidewalk and street opening permit and inspection fees, street opening degradation fees, pole replacement/erection fees, a pole maintenance fee, and an annual assessment per linear foot of underground and aerial facilities located in the City's rights-of-way.

[2] The fee resolution remained in effect.

[3] Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §§35101-39701.

[4] 53 Pa.C.S. §§2901-2984.
**(Footnote continued on next page…)**

2

The Ordinance described the City's rights-of-way as a "valuable resource and asset, not only for City purposes, but also for the benefit of third-party users, who rely upon the Rights-of-Way of the City for the installation and maintenance of various facilities owned and operated by such third-parties to their economic benefit . . . ." (Ordinance at 2.) The Ordinance stated that the management and maintenance of the public rights-of-way represented a "significant continuing operational and capitol cost" for the City, which, by extension, is passed on to City taxpayers, residents, and business owners. *Id.* The Ordinance also stated that it was necessary to recoup these maintenance and management costs from "the actual users of such facilities" in the City's rights-of-way. (Ordinance at 3.)

Section 263B of the Ordinance addresses PUC-regulated utilities and purports to grant various powers to the City. For example, section 263B-3 authorizes the City to conduct inspections to ensure that utility facilities within the rights-of-way do not constitute a public safety hazard and remain in compliance with PUC standards. Section 263B-4(6) authorizes the City to direct a utility to "temporarily or permanently remove, relocate, change, or alter the position of any Facilities within the Right-of-Way" under certain circumstances, including "the construction, repair, maintenance, or installation of any City or other public improvement," "the operations of the City," the "vacation of a Street or the release of a utility easement," or during emergency situations. (Ordinance at 7.) Additionally, section 263B-5 permits the City to impose an annual maintenance fee "in connection with the

---

**(continued…)**

[5] However, the City is actually organized under the Optional Third Class City Charter Law, Act of July 15, 1957, P.L. 901, *as amended,* 53 P.S. §§41101-41625.

ongoing use and occupancy of City Rights-of-Way" and section 263D-1 allows the City to impose a penalty for a violation of any provision of the Ordinance that is not within the exclusive jurisdiction of the PUC.[6] (Ordinance at 8, 16.)

---

[6] The relevant provisions of the Ordinance state, in full, as follows:

§263B-3 Right to Inspect

The City may conduct inspections of the City Rights-of-Way in order to ensure that Utility Facilities located within such Rights-of-Way do not constitute a public safety hazard, and remain in compliance with the standards set forth by the [PUC]. Such inspections shall be limited to establishing whether such Facilities meet relevant [PUC] standards, and comply with such City construction standards as relate to the opening and closing of City streets, curbs, and sidewalks, as provided under 15 Pa.C.S. §1511(e). In the event that the City determines that any Facilities of a Utility are not in compliance with such standards, then the City may bring a complaint against such Utility before the [PUC], in accordance with established [PUC] procedures. The City may also elect, in its discretion, to notify the Utility of the existence of any non-compliant Facilities, in order to abate such violations without the need for the filing of a formal [PUC] complaint.

§263B-4 Construction in the Rights-of-Way

. . .

(6) *Relocation or Removal of Facilities*. Within sixty (60) days following written notice from the City, or such longer period as the City determines is reasonably necessary or such shorter period in the case of an Emergency, a Utility shall temporarily or permanently remove, relocate, change or alter the position of any Facilities within the Right-of-Way, excluding those underground, whenever the City, consistent with [PUC] regulations, shall have determined that such removal, relocation, change or alteration is reasonably necessary under the following circumstances: the construction, repair, maintenance, or installation of any City or other public improvement in the Right-of-Way; the operations of the City or other governmental entity in the Right-of-Way; vacation of a Street or the release of a utility easement; or an Emergency as determined by the City. Utilities must relocate and remove Facilities consistent with the regulations and standards of the [PUC].

**(Footnote continued on next page…)**

4

(continued…)

. . .

§263B-5 Right-of-Way Maintenance Fee

(1) *Compensation for Right-of-Way Use.* Occupancy of City Rights-of-Way by any Utility is subject to the City's right to fix annually a fair and reasonable compensation, which shall be directly related to the City's actual Right-of-Way maintenance costs.

(2) *Annual Right-of-Way Maintenance Fee.* Each Utility with Facilities in the City's Rights-of-Way shall pay an annual fee to compensate the City for its costs incurred in connection with the ongoing use and occupancy of City Rights-of-Way. The Annual Right-of-Way Maintenance Fee shall be determined by the City and authorized by resolution of City Council and shall be based on the City's actual [right-of-way] maintenance costs. The Annual Right-of-Way Maintenance fee shall be fixed on a per-linear foot bases for Underground Facilities and on a per linear foot basis for Aerial Facilities. . . .

§263D-1 Penalties

(a) *PUC Regulated Utilities.* In the event a public utility is found by the City to have violated a PUC regulation, standard, or order, then the City may bring a complaint against such public utility before the [PUC] for violation of such regulation, standard, or order. The City may also notify the Utility of the existence of any suspected violation of PUC standards, regulations or order[s] in order to obtain compliance by the Utility.

In the event a public utility is found to have violated any other provision of this Chapter that is not within the exclusive jurisdiction of the PUC, then such public utility shall be subject, upon conviction thereof, to a fine not exceeding three hundred dollars ($300), for each and every offense, together with attorneys' fees and costs, and in default of the payment thereof, imprisonment for not more than ninety (90) days. A separate and distinct violation shall be deemed to be committed each day on which a violation occurs or continues to occur. In addition to an action to enforce any penalty imposed by this Chapter and any other remedy at law or in equity under this Title, the City may apply to a Court of Common Pleas for an injunction or other appropriate relief at law or in equity to enforce compliance with

**(Footnote continued on next page…)**

### III. Amended Petition for Review

PPL thereafter filed an amended petition for review seeking declaratory and injunctive relief and joining the PUC as an additional defendant. PPL noted that it is a regulated utility subject to the provisions of the Code and, in accordance with certificates of public convenience issued by the PUC, was authorized to offer, render, furnish, or supply utility service to nearly 1.4 million customers throughout its certificated service territory, which encompasses approximately 10,000 square miles, all or portions of 29 counties, and more than 630 cities, boroughs, and townships. PPL also noted that it rendered service to the public in accordance with a PUC-approved tariff, which includes a list of services, rules for service, and rates for service.[7] PPL stated that it owns, operates, and maintains approximately 43,000 miles of distribution lines, 5,000 miles of transmission lines, and 375 substations within its certificated territory.

PPL argued, generally, that the Ordinance violated the policy of the Commonwealth for a uniform, state-wide regulation of public utilities and public utility facilities; was preempted by the Commission's exclusive authority over the

---

**(continued…)**

> or restrain violation of any provision of this Chapter which is not subject to the exclusive jurisdiction of the PUC.

> Nothing in this Section shall be construed to permit the City to commence or attempt to commence prosecution of any PUC Regulated Utility for a violation of any regulation, standard or order of the PUC. . . .

(Ordinance at 6-8, 16.)

[7] A tariff has the force of law and is binding on the utility and its customers. *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission*, 663 A.2d 281, 284 (Pa. Cmwlth. 1995).

location, construction and maintenance of all public utility facilities; exceeded the City's authority under the Pennsylvania Municipalities Planning Code (MPC);[8] violated PPL's statutory right under section 1511(e) of the Business Corporation Law of 1988, 15 Pa.C.S. §1511(e), to use public rights-of-way without charge;[9] and imposed a fee schedule and penalties that amount to an unlawful tax.

More specifically, PPL's amended petition for review included five counts. In Count I, PPL alleged that the City's assessment of an annual maintenance fee under section 263B-5 and the fee resolution interfered with the PUC's exclusive jurisdiction and violated PPL's rights under the MPC. Count II alleged that the inspection requirements of section 263B-3 were preempted by the Code and violated PPL's rights under the MPC. Count III alleged that the Code preempted section 263D-1. Count IV alleged that the maintenance fee was an illegal tax. Count V averred that the Ordinance's relocation and removal provisions interfered with the PUC's exclusive jurisdiction and violated PPL's rights under the MPC.[10]

The City filed preliminary objections alleging that this Court lacked jurisdiction because the PUC was not an indispensable party to this action. The City further alleged a demurrer as to all counts stating that it acted entirely within its police powers in adopting the Ordinance, PPL failed to plead how the specific Ordinance provisions interfere with the PUC's exclusive jurisdiction or are

---

[8] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202.

[9] Section 1511(e) provides a public utility corporation with the "right to enter upon and occupy streets, highways, waters and other public ways and places for one or more of the principal purposes specified in subsection (a) (related to general rule that public utilities have the power of eminent domain) and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes. . . ."

[10] The amended petition for review contains two counts designated as Count IV. We therefore refer to the second Count IV as Count V.

7

preempted by the Code, and the MPC is irrelevant to the present action. PPL filed a response denying these allegations. By order dated April 28, 2014, this Court overruled the City's preliminary objections and directed the City to file an answer to PPL's amended petition for review.

The City later filed an answer denying the material allegations of PPL's amended petition for review and reiterating in new matter its previous assertions that it acted entirely within its police powers in adopting the Ordinance and that PPL failed to demonstrate how the specific Ordinance provisions interfere with the PUC's exclusive jurisdiction or are preempted by the Code. The City also asserted that the PUC has no jurisdiction to regulate rights-of-way fees, including maintenance fees, and that such fees are a method of cost recovery, not taxes. Both PPL and the PUC filed answers to this matter, denying these assertions.

## IV. Application for Summary Relief

PPL thereafter filed its application for summary relief which is presently before this Court.[11] PPL seeks a judgment in its favor with respect to counts I, II, III, and V of its amended petition for review, a declaration that sections 263B, 263B-4(6), 263B-5, and 263D-1 of the City's Ordinance are invalid and preempted by the Code,

---

[11] Pa.R.A.P. 1532(b) states that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Moreover, in ruling on a request for summary relief, this Court "views the evidence in the light most favorable to the non-moving party, and enters judgment only if there is no genuine issue as to any material fact and the right to relief is clear as a matter of law." *Hospital & Healthsystem Association of Pennsylvania v. Commonwealth*, 77 A.3d 587, 602 (Pa. 2013). "A fact is considered material if its resolution could affect the outcome of the case under the governing law." *Id.*

8

and an order enjoining the City from enforcing these provisions.[12]  We agree with PPL that the Code preempts sections 263B, 263B-4(6), and 263D-1 of the City's Ordinance.  However, we do not agree with PPL that the Code preempts the imposition of an annual maintenance fee pursuant to section 263B-5 of the City's Ordinance.

## V. Discussion

### A. Preemption

"Municipalities are creatures of the state and have no inherent powers of their own. Rather, they possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect." *Huntley & Huntley, Inc. v. Borough Council of Oakmont*, 964 A.2d 855, 862 (Pa. 2009). Additionally, under the law of preemption, "even in areas over which municipalities have been granted power to act, the state may bar local governing bodies from legislating in a particular field." *Hoffman Mining Company v. Zoning Hearing Board of Adams Township*, 32 A.3d 587, 593 (Pa. 2011).

In *Hoffman Mining Company*, our Supreme Court noted that there are three generally recognized types of preemption:

> (1) express or explicit preemption, where the statute includes a preemption clause, the language of which specifically bars local authorities from acting on a particular subject matter; (2) conflict preemption, where the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute; and (3) field preemption, where analysis of the entire statute

---

[12] Alternatively, PPL alleges that, as a matter of statutory construction, the City's authority over rights-of-way must be limited so as to give effect to the Code, and the challenged provisions of the Ordinance violate its statutory right to occupy a right-of-way.

reveals the General Assembly's implicit intent to occupy the field completely and to permit no local enactments.

*Id.* at 593-94 (citations omitted).

## B. Exclusive Authority of the PUC

The courts of this Commonwealth have long recognized the intent of our General Assembly that public utilities be regulated on a uniform basis by a statewide regulator and not be subject to the varied regulation of the many cities, townships, and boroughs throughout the Commonwealth. Over 100 years ago, our Pennsylvania Supreme Court addressed several ordinances passed by the city of York "for the purpose of regulating the measuring of water supplied to consumers," requiring York Water Company to install meters, at its own expense, when requested by a consumer, and prescribing penalties for failure to comply with the provisions of said ordinances. *York Water Company v. York*, 95 A. 396, 396 (Pa. 1915). York Water Company filed a bill in equity seeking to enjoin the city from enforcing these ordinances. The Court of Common Pleas of York County issued a decree granting York Water Company a perpetual injunction restraining the city from enforcement.

Referring to the predecessors of the current Code and PUC, the Supreme Court held as follows:

> There can be no reasonable doubt that the legislative intention was to make the Public Service Act the supreme law of the State in the regulation and supervision of public service corporations, and this being so, it follows as a necessary sequence that all laws inconsistent with the powers thus conferred must be held to be repealed or supplied thereby. . . The Public Service Company Law was intended to establish a complete and uniform system throughout the State for the enforcement of such powers as were conferred upon the Public Service Commission by that statute. . . .

10

> We do not mean to be understood as saying that cities of the third class, or of any other class for that matter, may not under their police powers prescribe reasonable regulations as a protection to the health, lives, property and safety of their inhabitants, even as applied to public service corporations. But such regulations are incidents of the police power and must be so restricted. Under the guise of a police regulation cities cannot undertake to determine the reasonableness of rates charged by public service corporations, nor can they prescribe regulations relating to the facilities, service and business of such corporations. These are the functions of the Public Service Commission and must be so regarded. The legislature has so declared and what the law making body does within the limit of its powers becomes a rule of action binding upon all branches of government, state or municipal, and upon the people as well.

*Id.* at 396-97.

Nearly four decades later, our Supreme Court reaffirmed this policy in *Duquesne Light Company v. Upper St. Clair Township*, 105 A.2d 287 (Pa. 1954). In that case, Duquesne Light Company, an electric utility company, sought approval from the PUC to build a transmission line through a residential area of Upper St. Clair Township. The construction of this new transmission line required Duquesne Light Company to obtain, by purchase or condemnation, various rights-of-way and easements. The PUC issued the necessary certificates of public convenience to Duquesne Light Company, which proceeded with the purchases and condemnation of lands and later commenced construction of the new line. The township sought to block the construction of the utility line towers on the grounds that their presence would violate the township's zoning ordinance. The township issued a notice of work stoppage to Duquesne Light Company, advising that a building permit must be secured and threatening the imposition of daily fines and the arrest of contractors if construction continued without a permit.

11

Duquesne Light Company filed an action in equity with the Court of Common Pleas of Allegheny County seeking to enjoin the township from enforcing its zoning ordinance. The common pleas court issued a decree, which granted the requested injunctive relief. The Supreme Court affirmed, citing the PUC's authority under section 901 of the then-existing Public Utility Code[13] to "supervise and regulate all public utilities doing business within the Commonwealth," and holding that "the policy of the Commonwealth in entrusting to the Commission the regulation and supervision of public utilities has excluded townships from the same field." *Duquesne Light Company*, 105 A.2d at 292. The court explained that:

> The Public Utility Code demonstrates without question that the Legislature of the Commonwealth of Pennsylvania has therein expressed its policy to commit the regulation of utilities to the Public Utility Commission and to impose a duty upon utilities to render efficient service. It is clear that the proposed transmission line is necessary for the rendition of efficient service to the public and that that necessity transcends the legitimate objectives of any one of the political subdivisions of the Commonwealth. We believe that this is the reason why the General Assembly entrusted the regulation of public utilities to a commission of state-wide jurisdiction. Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important, those authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference.

*Id.* at 293.

Twelve years later, in *County of Chester v. Philadelphia Electric Company*, 218 A.2d 331 (Pa. 1966), the Supreme Court affirmed a common pleas

---

[13] Act of May 28, 1937, P. L. 1053, *formerly* 66 P.S. §1341.

court decision declaring as unconstitutional a Chester County ordinance prohibiting persons or corporations from constructing pipelines without submitting plans related to the routes and use of such lines to the Chester County Planning Commission and once again reaffirming the exclusive jurisdiction of the PUC with respect to regulation of public utilities. The court held that:

> The necessity for conformity in the regulation and control of public utilities is as apparent as the electric lines which one views traversing the Commonwealth. If each county were to pronounce its own regulation and control over electric wires, pipelines and oil lines, the conveyors of power and fuel could become so twisted and knotted as to affect adversely the welfare of the entire state. It is for that reason that the Legislature has vested in the Public Utility Commission exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities. . . .

*Id.* at 333.

More recently, this Court reaffirmed this reasoning in *PECO Energy Company v. Township of Upper Dublin*, 922 A.2d 996 (Pa. Cmwlth. 2007), and *Pennsylvania Power Company v. Township of Pine*, 926 A.2d 1241 (Pa. Cmwlth. 2007), both of which invalidated a township's attempt to regulate a public utility. In *Township of Upper Dublin*, the township enacted an ordinance to regulate the manner in which a public utility trims shade trees within the township's rights-of-way. The Court of Common Pleas of Montgomery County granted the motion of PECO Energy Company for judgment in mandamus, holding that the township "possesses no authority to regulate PECO's vegetation management practices, which fall within the Public Utility Code's definition of 'utility service' and are solely regulated by the [PUC]." *Id.* at 999.

13

This Court affirmed, noting that PECO's tariff specifically authorizes it "to trim, remove, or separate trees, vegetation or any structures therein, which, in the opinion of [PECO], interfere with its aerial conductors" and that "[p]ublic utility tariffs have the force and effect of law, and are binding on the customer as well as the utility." *Id.* at 1004 (citations omitted). We also noted that, consistent with a public utility's duties under section 1501 of the Code, 66 Pa.C.S. §1501,[14] and the Code's definition of service in section 102, 66 Pa.C.S. §102,[15] "[u]tility service is not confined to the distribution of electrical energy, but includes 'any and all acts' related to that function," such as vegetation management activities. *Id.* at 1005 (citing *West*

---

[14] Section 1501 states as follows:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission. Subject to the provisions of this part and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service. Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility. The commission shall have sole and exclusive jurisdiction to promulgate rules and regulations for the allocation of natural or artificial gas supply by a public utility.

[15] Section 102 defines "Service," in pertinent part, as "[u]sed in its broadest and most inclusive sense, includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this part to their patrons, employees, other public utilities, and the public . . . ."

*Penn Power Company v. Pennsylvania Public Utility Commission*, 578 A.2d 75, 77 (Pa. Cmwlth. 1990), *appeal denied*, 593 A.2d 429 (Pa. 1991)).

Most importantly, we concluded that "the legislature intended the Public Utility Code to preempt the field of public utility regulation." *Township of Upper Dublin*, 922 A.2d at 1005 (emphasis added). Further, citing *Duquesne Light Company*, *County of Chester*, and *West Penn Power Company*, as well as the PUC's electric safety and reliability regulations and its then-proposed inspection and maintenance regulations, which directly conflicted with the township's shade tree ordinance, we held that the township was preempted by the Code and PUC regulations "from applying its shade tree ordinance pruning standards to PECO's vegetation management practices." *Id.*

In *Township of Pine*, the township denied the application of Pennsylvania Power Company for a permit to install poles and utility lines along a public right-of-way in the township. The township demanded that such service be underground, consistent with an agreement entered into by the township and a private developer with respect to a residential subdivision. Pennsylvania Power Company appealed the denial of a permit to the common pleas court, which affirmed the township's denial based upon section 57.84 of the PUC regulations, 52 Pa. Code §57.84, which requires that new distribution lines located within 100 feet of a development be placed underground, "if practicable." The common pleas court also relied on *Duquesne Light Company* as support for its decision that the township may define by ordinance a reasonable underground wiring district. On further appeal, this Court vacated the decision of the common pleas court and directed that the matter be transferred to the PUC.

We began our analysis by noting that the common pleas court misinterpreted the holding in *Duquesne Light Company*, as that case "neither

15

expanded the authority of local government bodies over public utilities, nor diminished the authority of the PUC. It simply reconciled two conflicting statutes and reaffirmed the long line of decisions in this Commonwealth establishing that a municipality may not, through ordinance or otherwise, *compel* the underground installation of electric utilities." *Township of Pine*, 926 A.2d at 1249 (emphasis in original). Additionally, we noted that the township had never passed an ordinance or regulation pursuant to its home rule powers that would require a utility to place its lines underground, but instead relied upon its authority to issue permits under section 18 of the Act of May 11, 1911, P.L. 244, *as amended*, 53 P.S. §1991 (section 1991).[16]

However, we stated that the permit powers in section 1991 were not unlimited, and that section 1991 had been repealed insofar as it was inconsistent with section 1511(a)(2) of the Business Corporation Law of 1988 (BCL), which grants a public utility "the right to take, occupy and condemn property" for the "transportation of artificial or natural gas, electricity, petroleum or petroleum products or water or any combination of such substances for the public." 15 Pa.C.S. §1511(a)(2). In addition, we cited section 1511(e) of the BCL, which specifically addresses a public utility's right to occupy streets and other public rights-of-way for the "placement,

---

[16] This section addresses the use of streets by public utilities, providing as follows:

> The proper corporate authorities of such municipality shall have the right to issue permits determining the manner in which public service corporations or individuals shall place, on or under or over such municipal streets or alleys, railway tracks, pipes, conduits, telegraph lines, or other devices used in the furtherance of business; and nothing herein contained should be construed to in any way affect or impair the rights, powers, and privileges of the municipality in, on, under, over, or through the public streets or alleys of such municipalities, except as herein provided.

maintenance and removal of aerial, surface and subsurface public utility facilities thereon or therein." 15 Pa.C.S. §1511(e).[17]

Construing section 1991, section 1511 of the BCL, and the Code together, we held that the "the scope and breadth of [the township's] permit authority ha[d] been limited by *Section 1511 of the BCL* to matters of local concern," *i.e.*, the time and manner of opening a street, and "[b]ecause the underground installation of a distribution line within the Township's right-of-way is not, by statutory definition, a matter of local concern, the Township has no authority to require Penn Power to proceed in that fashion." *Township of Pine*, 926 A.2d at 1251. Further, we emphasized "the 'initial and exclusive authority' of the PUC to first determine public utility regulatory matters. . . ." *Id.* at 1252. Because a question remained in that case regarding whether, consistent with PUC regulations, the placement of underground

---

[17] Section 1511(e) provides, in full, as follows:

> A public utility corporation shall have the right to enter upon and occupy streets, highways, waters and other public ways and places for one or more of the principal purposes specified in subsection (a) and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes, including the placement, maintenance and removal of aerial, surface and subsurface public utility facilities thereon or therein. Before entering upon any street, highway or other public way, the public utility corporation shall obtain such permits as may be required by law and shall comply with the lawful and reasonable regulations of the governmental authority having responsibility for the maintenance thereof.

We further noted in *Township of Pine* that the Amended Committee Comment-1990 to section 1511 of the BCL explains that "reference in the last sentence of subsection (e) to 'permits' is a codification of the prior law **relating to the time and manner of opening a street**, etc., and is not intended to imply a power to decide whether or not, and by whom, a type of utility service may be offered by means of the contemplated facilities." *Id.* at 1251 (citation omitted) (emphasis in original).

17

utility lines was practicable, we vacated the common pleas court's decision and transferred the matter to the PUC.

### C. City of Lancaster Ordinance

In the present case, the City similarly relies on section 1991 and section 1511(e) of the BCL as support for its authority to regulate utilities within its rights-of-way. However, we reject these arguments based upon our decision in *Township of Pine*. The City also relies on section 701 of the Code, 66 Pa.C.S. §701, and its police powers under the TCCC. However, such reliance is misplaced. Section 701 of the Code merely authorizes the City to file a written complaint with the Commission whenever a public utility acts or fails to act in violation of "any law which the [PUC] has jurisdiction to administer" or "any regulation or order of the [PUC]."[18] This section does not convey any authority to municipal organizations, let alone empower the City to enact ordinances regulating public utilities.

---

[18] Section 701 provides in full as follows:

> The commission, or any person, corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission. Any public utility, or other person, or corporation likewise may complain of any regulation or order of the commission, which the complainant is or has been required by the commission to observe or carry into effect. The Commonwealth through the Attorney General may be a complainant before the commission in any matter solely as an advocate for the Commonwealth as a consumer of public utility services. The commission may prescribe the form of complaints filed under this section.

66 Pa.C.S. §701.

The City cites its general police powers under former section 2403(60) of the TCCC, which empowered it to "make and adopt all such ordinances, by-laws, rules and regulations, **not inconsistent with or restrained by the Constitution and laws of this Commonwealth**, as may be expedient or necessary for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government, safety and welfare of the city. . . ." 53 P.S. §37403(60) (emphasis added).[19] The City also cites its general power under section 2915(3) of the TCCC to keep its rights-of-way "in order and repair and in safe passable condition." 53 P.S. §37915(3). Again, however, neither of these provisions authorizes the City to enact ordinances regulating public utilities. Moreover, similar to *Township of Upper Dublin*, where the First Class Township Code (FCTC),[20] the authority upon which the township relied in enacting its shade tree ordinance, contained a general repeal provision stating that nothing in that act shall "repeal or modify any of the provisions of the [Code],"[21] the TCCC includes a general repeal provision at section 4701 stating that "[n]othing contained in this act shall be construed to repeal any local or special laws; or to repeal the provisions of 66 Pa.C.S. Pt. I, known as the Public Utility Code. . . ." 53 P.S. §39701.

Furthermore, the relevant provisions of the Ordinance implicate subjects, including the inspection and location of utility facilities and the imposition of fees and penalties, that are committed to the PUC's exclusive jurisdiction by the Code. We will discuss each of these provisions separately below.

---

[19] This section was repealed by the Act of March 19, 2014, P.L. 52, and an analogous provision was enacted at section 2435 of the TCCC, 53 P.S. §37435.

[20] Act of June 24, 1931, P.L. 1206, *as amended*, 53 P.S. §§55101-58502.

[21] *See* Section 3502 of FCTC, 53 P.S. §58502.

## Section 263B-3 of the Ordinance

Section 263B-3 of the Ordinance purports to authorize the City to inspect public utility facilities to ensure that such facilities do not constitute a public safety hazard and remain in compliance with PUC standards. As PPL states, this provision essentially makes the City a regulator itself.

However, the General Assembly has declared, as the policy of this Commonwealth, that because "continuing and ensuring the reliability of electric service depends on adequate generation and on conscientious inspection and maintenance of transmission and distribution systems, the independent system operator or its functional equivalent should set, and the commission shall set through regulations, inspection, maintenance, repair and replacement standards and enforce those standards." Section 2802(20) of the Code, 66 Pa.C.S. §2802(20). In this regard, the Code specifically empowers the PUC to: appoint inspectors to ensure "the proper conduct of the work of the [PUC]," and "for the purpose of enforcing the [Code's] provisions, sections 305(c) and 307 of the Code, 66 Pa.C.S. §§305(c), 307; "investigate and examine the condition and management of any public utility," section 331 of the Code, 66 Pa.C.S. §331; and "enter upon the premises, buildings, machinery, system, plant, and equipment, and make any inspection, valuation, physical examination, inquiry, or investigation of any and all plant and equipment, facilities, property. . . of any public utility," section 506 of the Code, 66 Pa.C.S. §506. In addition, the PUC has enacted regulations setting forth specific inspection and maintenance standards relating to utility poles, overhead lines, transformers,

switching and protective devices, regulators, capacitors, and substations. *See* 52 Pa. Code §57.198.[22]

**Section 263B-4(6) of the Ordinance**

Section 263B-4(6) of the Ordinance purports to grant the City the power to order a public utility to remove, relocate, change, or alter the position of any facilities within the right-of-way whenever the City determines that it is "reasonably necessary" to do so "or such shorter period in the case of an Emergency." However, as our Supreme Court stated in *County of Chester*, "the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the **location, construction and maintenance** of all public utilities facilities. . . ." 218 A.2d at 333 (emphasis added). In this regard, section 1505(a) of the Code directs the PUC as follows:

> Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this part, the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public.

---

[22] The City asserts that the PUC "*has absolutely no infrastructure or staff* to implement [its] regulations or to conduct any inspections." (Brief of City at 44) (Emphasis in original). However, even if the City is correct, the lack of such staff does not empower the City to undertake the duties specifically reserved to the PUC by statute and by the aforementioned case law declaring the PUC to be the sole regulator of public utilities.

66 Pa.C.S. §1505(a). Further, the PUC has promulgated extensive regulations relating to the location of line extensions, transmission lines, and underground electric service. *See* 52 Pa. Code §§57.19, 57.71-57.77, 57.81-57.88, 69.3101-69.3107.

The City contends that section 263B-4(6) does not conflict with the Code. The City acknowledges the existence of the above-mentioned regulations, which the City asserts specifically limit application of this section of the Ordinance. The City cites that portion of section 263B-4(6) which states that "Utilities must relocate and remove Facilities consistent with the regulations and standards of the [PUC]." However, such limitation does not overcome the fact that section 263B-4(6), like section 263B-3 above, essentially makes the City a regulator itself with the authority to direct the relocation or removal of public utility facilities. Again, our General Assembly and the courts of this Commonwealth have recognized that such authority rests solely with the PUC.

**Section 263B-5 of the Ordinance**

Section 263B-5 seeks to impose an annual maintenance fee on any public utility with facilities in the City's rights-of-way. PPL argues that such a fee is redundant to the annual assessment fee that it pays to the PUC for regulatory expenses under section 510 of the Code, 66 Pa.C.S. §510. Section 510 of the Code, 66 Pa.C.S. §510, imposes an annual assessment on public utilities for its regulatory expenses. The PUC calculates this assessment in accordance with a formula set forth in section 510(b), which includes consideration of the amount of PUC expenditures "directly attributable to the regulation of each group of utilities furnishing the same kind of service" and the "gross intrastate operating revenues" and "sum of the debits"

22

of a particular utility group as compared to all utility groups. 66 Pa.C.S. §510(b)(1)-(4).

However, as the City correctly notes, the proposed annual maintenance fee represents the costs it expends to maintain the rights-of-way occupied by public utilities and no section of the Code provides for an annual assessment of these costs. Our Supreme Court has held that maintenance of rights-of-way is within the ambit of the traditional exercise of municipal police powers and the assessment of a reasonable fee for the recovery of costs incurred by the City expended in maintaining such rights-of-way does not constitute local regulation of public utilities. *See Adams v. New Kensington*, 55 A.2d 392, 394-95 (Pa. 1947); *Kittanning Borough v. American Natural Gas Company*, 86 A. 717, 717-18 (Pa. 1913).

Moreover, we note that the City is a home rule municipality. As such, it has the legal ability to assess fees for recovery of costs under its home rule powers, which are not constrained by Dillon's Rule, and generally enable it to undertake government action unless preempted by a law of statewide applicability. Since the Code does not preempt the imposition of an annual fee relative to the maintenance of the City's rights-of-way, it may do so provided the fee is reasonable in relation to the costs incurred by the City for such purpose and not a tax.

Furthermore, we are not persuaded by PPL's contention that the City's imposition of an annual maintenance fee will be ultimately passed back on to consumers through the PUC's ratemaking process. This contention is speculative and presumes the PUC will merely rubberstamp a PPL rate increase and pass it along to consumers, which in turn insinuates that the PUC will not exercise proper oversight should PPL seek a rate increase. We are likewise not persuaded by PPL's fears that the impact on consumer rates could be magnified exponentially if each of the 652 municipalities in PPL's service territory imposed their own annual maintenance fees.

23

This argument is not only speculative but specious as the same could be said of any kind of local government assessment for taxes or fees. Such an argument is also best directed to the legislative branch of government which can revise the Code to preempt the imposition of local maintenance fees for public rights-of-way.

In light of the above, the issue as to the imposition of an annual right-of-way fee is not whether it is preempted by the Code, but whether the fee is reasonable and not a tax. This issue cannot be determined at this summary stage of the proceedings and may require further factual development; hence, we must deny PPL's application for summary relief as to Count I of its amended petition for review.

### Section 263D-1 of the Ordinance

Section 263D-1 addresses both PUC-regulated utilities (263D-1(a)) and non-PUC-regulated entities (263D-1(b)). Regarding the former, this section seeks to permit the City to bring a complaint against a public utility "[i]n the event a public utility is found by the City to have violated a PUC regulation, standard, or order . . . ." This section also permits the City to "notify the Utility of the existence of any suspected violation of PUC standards, regulations or order [sic] in order to obtain compliance by the Utility." Additionally, this section states that if a public utility is found to have violated any provision of the Ordinance that is not within the PUC's exclusive jurisdiction, then the public utility "shall be subject, upon conviction thereof, to a fine not exceeding three hundred dollars ($300), for each and every offense, together with attorneys' fees and costs, and in default of the payment thereof, imprisonment for not more than ninety (90) days." Further, this section deems each day a violation continues to occur as a separate and distinct violation.

We agree with PPL that section 263D-1(a) attempts to impose an overlapping enforcement regime for public utilities that is preempted by the Code.

24

As noted above, section 1505 of the Code specifically authorizes the PUC, by its own motion or upon the filing of a complaint by a third party, to: convene a hearing; make findings regarding the reasonableness, safety, adequacy, and sufficiency of a public utility's service and/or facilities; and to prescribe, by regulation or order, any necessary repairs, changes, alterations, extensions, substitutions, or improvements in this service or facilities. Additionally, section 3301(a) of the Code, 66 Pa.C.S. §3301(a), provides for the imposition of civil penalties against a public utility for any violation of the Code, PUC regulation, or PUC final determination or order. Section 3301(b) addresses continuing offenses and states that "[e]ach and every day's continuance in the violation of any regulation or final direction, requirement, determination, or order of the commission . . . shall be a separate and distinct offense." 66 Pa.C.S. §3301(b).

Moreover, section 3314(a) of the Code sets forth a three-year statute of limitations for the recovery of any penalties or forfeitures incurred under the Code, commencing from the "date at which the liability therefor arose. . . ." 66 Pa.C.S. §3314(a). Furthermore, the PUC has promulgated its own investigation and enforcement regulation, 52 Pa. Code §57.197, as well as a regulation setting forth the factors and standards that the PUC will consider in imposing penalties or approving settlements for a violation, 52 Pa. Code §69.1201.

The City contends that the Ordinance does not create an overlapping enforcement regime, but instead recognizes the jurisdiction of the PUC. In support of this contention, the City cites that portion of section 263D-1(a) limiting imposition of fines to violations of Ordinance provisions "not within the exclusive jurisdiction of the PUC" and recognizing that "[n]othing in this Section shall be construed to permit the City to commence or attempt to commence prosecution of any PUC Regulated Utility for a violation of any regulation, standard or order of the PUC." The City

25

notes that, in such situations, its only recourse is to file a complaint with the PUC under section 701 of the Code.

However, the City ignores that portion of section 263D-1(a) that permits the City to independently contact a public utility and advise the public utility of the City's perceived violations of the Code or the PUC's regulations or orders. Similar to the aforementioned sections of the Code, section 263D-1(a) essentially makes the City a regulator itself. Indeed, in its answer and new matter to PPL's amended petition for review, the City conceded that the Ordinance was an attempt to exercise "concurrent" authority with the PUC over management of its rights-of-way. (City's Answer and New Matter, May 27, 2014, ¶111.)

## Conclusion

Summary relief is appropriate where there are no genuine issues of material fact and the right to relief is clear as a matter of law. Pa.R.A.P. 1532(b); *Hospital & Healthsystem Association of Pennsylvania*. A century of case law has firmly established that the General Assembly's intent in enacting the Code and its predecessor statute was to provide for the uniform, statewide regulation of public utilities and public utility facilities. Indeed, this Court has expressly held that "the legislature intended the Public Utility Code to preempt the field of public utility regulation." *Township of Upper Dublin*, 922 A.2d at 1005. For the reasons stated above, we conclude that sections 263B-3, 263B-4(6), and 263D-1 of the City's Ordinance are preempted by the Code, and, hence, are invalid. However, we conclude that section 263B-5 of the City's Ordinance, by which the City imposes an annual right-of-way maintenance fee based only on its costs to maintain the same, is not a public utility regulation and, hence, is neither preempted by the Code nor invalid.

26

Because no genuine issues of material fact remain to be decided as to counts II, III, and IV of PPL's amended petition for review and PPL has established a clear right to relief as a matter of law, we grant PPL's application for summary relief and enter judgment in its favor with respect to these counts. The City is specifically enjoined from enforcing sections 263B-3, 263B-4(6), and 263D-1 of its Ordinance.[23] However, because we disagree with PPL that section 263B-5 of the City's Ordinance is preempted by the Code, we deny PPL's application for summary relief as to Count I of its amended petition for review.[24] As noted above, the issues regarding the reasonableness of the annual maintenance fee imposed under section 263B-5 of the City's Ordinance, and whether said fee is a tax, may require further factual development before this Court.

_____
PATRICIA A. McCULLOUGH, Judge


Judge McGinley dissents.
Judge Leadbetter joins in part but dissents to maintenance fee (Section 263B-5) only.

_____

[23] Based upon this determination, we need not address PPL's alternative arguments relating to statutory construction and its right to occupy a right-of-way.

[24] The dissent would deny PPL's application for summary relief and hold that none of the relevant sections of the City Ordinance are preempted by the Code because section 1511(e) of the BCL requires public utilities to comply with a municipality's "reasonable regulations." 15 Pa.C.S. §1511(e). The Majority does not deny that a municipality owns a right-of-way, that it has a duty to maintain the right-of-way, or that it may enact "reasonable regulations" with respect to a right-of-way. Indeed, we have denied PPL's application for summary relief relating to the City's imposition of an annual maintenance fee. However, the dissent ignores that these "reasonable regulations" are subject to the restrictions imposed by the General Assembly under the Code, as well as over 100 years of case law which recognized the Code as "the supreme law of the State," *York Water Company*, 95 A. at 397, and preempting "the field of public utility regulation," *Township of Upper Dublin*, 922 A.2d at 1005. As the Majority notes above, the relevant provisions of the City's Ordinance implicate subjects that are committed to the PUC's exclusive jurisdiction under the Code.

27

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation, :
                      Petitioner :
                     : No. 462 M.D. 2013
          v. :
                     :
City of Lancaster and Pennsylvania :
Public Utility Commission, :
                  Respondents :

## ***ORDER***

AND NOW, this 15th day of October, 2015, the application for summary relief filed by PPL Electric Utilities Corporation (PPL) is granted as to counts II, III, and V of its amended petition for review. We hereby declare sections 263B-3, 263B-4(6), and 263D-1 of the December 17, 2013 Ordinance enacted by the City of Lancaster (City) to be preempted by the Public Utility Code, and enjoin the City from enforcing these sections. PPL's application for summary relief as to Count I is denied. Section 263B-5 of the City's Ordinance is not preempted by the Code.

                                         _____
                                         PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PPL Electric Utilities Corporation, :
               Petitioner :
               :
           v. : No. 462 M.D. 2013
               : Argued: June 17, 2015
City of Lancaster and Pennsylvania :
Public Utility Commission, :
              Respondents :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
                HNORABLE BERNARD L. McGINLEY, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge


DISSENTING OPINION BY
PRESIDENT JUDGE PELLEGRINI            FILED: October 15, 2015


        The City of Lancaster (City), a home rule municipality,[1] enacted Chapter 263 of the City Code entitled "Right of Way Management" imposing certain requirements on entities whose facilities occupy the City's right-of-way, including public utilities. The issue in this case is whether the Public Utility Code[2] preempts

---

[1] Lancaster adopted a home rule form of government under the former Third Class City Optional Charter Law (Optional Charter Law), Act of July 15, 1957, P.L. 901, *as amended*, 53 P.S. §§41101-41625. That Act has been supplanted by the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. §§2901-3171. For a full discussion, *see Harrisburg School Dist. v. Hickok,* 781 A.2d 221, 239 (Pa. Cmwlth. 2001).

[2] 66 Pa. C.S. §§101-3316.

local municipalities from including public utilities in a comprehensive management plan that seeks to regulate the occupation of the public right-of-way between the varying public and private interests whose facilities occupy the public streets. With the exception of a provision that imposes an annual maintenance fee, the majority finds that the comprehensive plan provisions are preempted by the Public Utility Code. Because I would find that the right-of-way comprehensive management plan embodied in Chapter 263 of the City Code is specifically recognized rather than be preempted,[3] I respectfully dissent.

## I.

Before examining whether municipalities have been preempted from regulating public utilities, we must first look at the nature of the right-of-way.[4] When

---

[3] While it is often said that municipalities are creatures of the General Assembly and possess only such powers that are expressly granted to them, those formulations have not been accurate since our Constitution was amended in 1968 to provide that "[t]he General Assembly shall provide by general law for local government within the Commonwealth." Pa. Const. art. IX, §1. Since then, local government is an absolute right and the state cannot take it away. The Pennsylvania Constitution also provides that "[m]unicipalities shall have the right and power to frame and adopt home rule charters…." Pa. Const. art. IX, §2. Home rule means that it is not the state's prerogative to run and operate the machinery of local government, but to provide for it and to put it in operation and that a home rule municipality "may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." *Id.* Precisely speaking, municipalities are not creatures of the General Assembly, but creatures of the Constitution so that local matters are addressed by local citizens and the officials that they elect.

[4] The public right-of-way is composed of the street which encompasses two distinct portions: the roadway used for vehicles and the sidewalk for pedestrians. *Mercantile Library Co. v. Fidelity Trust Co.*, 83 A. 592 (Pa. 1912). It can include the pavement, shoulders, gutters and curbs within the street lines. *Granchi v. Borough of North Braddock*, 810 A.2d 747 (Pa. Cmwlth. 2002). The roadway is generally accepted as the paved and traveled portion. *Babcock v. Department of Transportation*, 626 A.2d 672 (Pa. Cmwlth. 1993), *appeal denied*, 639 A.2d 53 (Pa. 1994). While the sidewalk is a place set apart at the side of a street for use by that portion of the public who travels on foot, it need not be improved to be a sidewalk. *Callahan v. A. Wishart & Sons Co.*, 76

**(Footnote continued on next page…)**

a municipality, by dedication or otherwise, obtains a public right-of-way, it is held in trust for the public.  A municipality is not restricted to using the street only for the public's right of passage and may allow additional use of the right-of-way as long as it is for a use that serves the public generally, is consistent with its use as a public street, and does not burden the abutting property owner's property.  *In re City of Altoona*, 388 A.2d 313 (Pa. 1978).  However, the fee owner does not surrender his entire title to the land so dedicated, but reserves the fee in the residue and may exercise full rights of ownership to that residue, above and below the surface.  *Breinig v. County of Allegheny*, 32 A.2d 842 (Pa. 1938); *Gramlich v. Lower Southampton Township* 838 A.2d 843 (Pa. Cmwlth. 2003); *Miller v. Nichols*, 526 A.2d 794 (Pa. Super. 1987).

Initially, whether the occupation of the street by public utilities and street railroads was for a public purpose was problematic because the nature of the company was partly public and partly private, that is, although for-profit, it had public privileges and public duties.  Delos F. Wilcox, *Municipal Franchises*, Vol. II, §277 (1910).  *See also Shuster v. Central District & Printing Telephone Co*., 34 Pa. Super. 513 (1907) (property owner entitled to compensation for telephone wires placed along street); *Berlew v. Electric Illuminating Company*, 1 Pa. C.C. 651 (Northumb. 1886) (requiring utility to pay the owner of abutting property compensation for putting poles and wires along the street).  However, later, public

---

**(continued…)**

A.2d 386 (Pa. 1950).  The remainder of the public right-of-way is that area not used for either streets or sidewalks occupied by public utilities, cable and water and sewer lines and such.

utilities, cable, sewer, water, street railways, subways and steam heat were held for public purposes and could occupy the right-of-way without compensating the abutting property owner.[5]

As a result, beneath the streets of a municipality exists a network of walls, columns, cable pipes and tunnels that go over and around each other that are required to service the needs of the municipality's inhabitants. Some of those facilities are those of public utilities that are subject to regulation by the Public Utility Commission (PUC); cable providers are regulated, in part by the federal government, while others by the municipality itself or municipal authorities and some by the adjoining properties who have lateral lines in the right-of-way to service their properties as well as vaults in the right-of-way.

---

[5] Prior to 1966, the extent of a public use easement varied according to whether the street or road was located in an urban or rural area. Rural roads were held to be for public passage only, whereas city streets were for "any public service." *46 South 52nd Street Corp. v. Manlin*, 157 A.2d 381, 386 (Pa. 1960). *See also William Laubach & Sons v. City of Easton*, 32 A.2d 881 (Pa. 1943). In 1966, the Supreme Court discarded the distinction between city streets and rural roads and held that the rule applicable to city streets was equally applicable to rural roads. *Pittsburgh National Bank v. Equitable Gas Co.*, 220 A.2d 12 (Pa. 1966). The court held that a subsurface pipeline which had been laid in the bed of a township road did not constitute an additional burden upon the abutting land. "[A]n existing street or public road," the Court said, "may be used for any public service without additional compensation due the abutting landowner." *Id*. at 14. "[W]hen any public road is established, it is clearly for the purpose of public travel and commerce." *Id*. at 16. The Court reasoned: "As the means and modes of public commerce increase, what at one time would have been considered a burden on the abutting landowner is no longer so.... Evolutionary changes must be considered in determining whether a burden is imposed on the servient tenement." *Id*. *See also Smith v. Adams*, 523 A.2d 788 (Pa. Super. 1987). Of course, "[i]f a use obstructs the abutting land or is of a new nature not in accord with the mainstream of today's commerce, it will still be held a violation of the landowner's rights." *Pittsburgh National Bank*, 220 A.2d at 16 n.2.

The question then is who is going to facilitate and arbitrate all of those competing interests in the right-of-way, which are owned, operated and regulated by different entities, so that the public interest in all of them can be served. The answer to that question is simple: the municipality that owns and maintains the right-of- way in trust for the public, *i.e.*, their citizens.

## II.

In general, a municipality has the right to regulate the public right-of-way. *Shuck v. Borough of Ligonier*, 22 A.2d 735 (Pa. 1941). Also, in general, a municipality can decide what entity is authorized in the right-of-way and under what conditions. That is only true "in general" because a municipality cannot prevent a public utility from using its right-of-way. However, it is also clear that a municipality can subject the public utility to "reasonable regulations." Section 1511(e) of the Business Corporation Law of 1988 (BCL), 15 Pa. C.S. §1511(e), gives the power to a public utility to place its public utility facilities in the right-of-way and also specifically subjects them to reasonable municipal regulation. It provides:

> A public utility corporation shall have the right to enter upon and occupy streets, highways, waters and other public ways and places for one or more of the principal purposes specified in subsection (a) and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes, including the placement, maintenance and removal of aerial, surface and subsurface public utility facilities thereon or therein. **Before entering upon any street, highway or other public way, the public utility corporation shall obtain such permits as may be required by law and shall comply with the lawful and reasonable regulations of the governmental authority having responsibility for the maintenance thereof**.

15 Pa. C.S. §1511(e) (emphasis added),

Note that this provision gives public utilities the right to occupy the right-of-way; it does not give them the right to place facilities anywhere that they want. That is subject to reasonable regulation by the municipality.

Chapter 263 of the City Code regulates any entity that occupies the right-of-way. Recognizing that some facilities also have obligations to other regulators, it makes distinctions between public utilities, non-public utilities, and cable companies that occupy the right-of-way under franchises awarded by the City. Section 263B of the City Code addresses PUC-regulated utilities and authorizes the City to:

> • conduct inspections to ensure that utility facilities in the rights-of-way do not constitute a public safety hazard and are in compliance. If they are not in compliance with such standards, it authorizes the City to bring a complaint before the PUC to seek compliance. It also allows the City to notify the Utility of the existence of any non-compliant facilities to voluntarily abate such violations. (Section 263B-3; Section 263D-1).
>
> • direct a utility to "temporarily or permanently remove, relocate, change, or alter the position of any facilities within the Right-of-Way" under certain circumstances, including "the construction, repair, maintenance, or installation of any City or other public improvement," "the operations of the City," the "vacation of a Street or the release of a utility easement," or during emergency situations. Section 263B-4(6).
>
> • imposition of an annual maintenance fee "in connection with the ongoing use and occupancy of City Rights-of-Way." (Section 263B-5).

•      allows for the imposition of a penalty for a violation of any provision of the Ordinance that is not within the exclusive jurisdiction of the PUC. (Section 263D-1). (The majority does not discuss this provision because it is not preempted by its very terms.)

I see nothing at this stage of the proceeding in these provisions that is preempted by the Public Utility Code and nothing that constitutes an "unreasonable regulation" within the meaning of Section 1511(e) of the BCL.

Section 263B-3 of the City Code, which authorizes the City to inspect public utility facilities to ensure that such facilities do not constitute a public safety hazard and remain in compliance with PUC standards, does not make the City a regulator, but is more like an instruction to the charged employees to make sure that the right-of-way is safe for the public, the abutting owner and other users of the right-of-way. If a public utility facility is in such a condition as to pose a public safety hazard, Section 263D-1 only authorizes the City to file a complaint before the PUC to see that the public safety hazard is abated or to seek voluntary compliance from the public utility. Moreover, it follows the procedure specifically outlined in Section 1505(a) of the Public Utility Code, 66 Pa. C.S. §1505(a), set forth below.

The majority finds that Section 263B-4(6)'s provision allowing it to grant to the City the power to order a public utility to remove, relocate, change or alter the position of any facilities within the right-of-way whenever the City determines that it is "reasonably necessary" to do so "or such shorter period in the case of an emergency" is preempted. It cites to Section 1505(a) of the Public Utility Code, which provides:

> Whenever the commission, after reasonable notice and hearing, **upon its own motion or upon complaint,** finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this part, the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public.

66 Pa. C.S. §1505(a) (emphasis added). In essence, the majority reasons that the power to determine where facilities are located in the right-of-way does not fall within Section 1511(e) of the BCL giving municipalities the power to enact "lawful and reasonable regulations" regarding the right-of-way because it is not a matter of "local concern" and must be handled by the PUC as matter of statewide concern.

What that ignores is that what goes on in the right-of-way is a matter of local concern because municipalities are the ones that own and maintain them. If, for example, there is a gas line break 12 feet under a municipal water line, an order directing that the water line be temporarily relocated is eminently reasonable. Squarely put, the PUC could not issue such an order because it has no jurisdiction to order a municipal entity to move the line. That is why the General Assembly authorized municipalities to enact "reasonable regulations" concerning the public utilities' use of the right-of-way.

Moreover, we must remember that the right-of-way is a finite resource and all of the public users have to be accommodated, not just the public utilities. The PUC

only regulates public utility services and does not have any power over non-public utility users of the right-of-way. If it is determined that a cable or a water line has to be moved to accommodate a needed public utility service, it cannot order that those facilities have to be moved; only the local municipality which owns the right-of-way in trust for the public has the power to do so and to balance the interests of those involved.

Because Section 1511(e) of the BCL gives the power to municipalities to enact reasonable regulations, the municipality owns the right-of-way and I would deny PPL Electric Utilities Corporation's application for summary relief for the foregoing reasons. Accordingly, I respectfully dissent.

_____
DAN PELLEGRINI, President Judge

Judge McGinley joins in this dissenting opinion.