**[J-8A-2019 and J-8B-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| PPL ELECTRIC UTILITIES CORPORATION, | : | No. 55 MAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court dated |
| | : | September 22, 2017, exited |
| | : | September 25, 2017, |
| v. | : | at No. 462 MD 2013. |
| | : | |
| | : | ARGUED: March 5, 2019 |
| CITY OF LANCASTER AND | : | |
| PENNSYLVANIA PUBLIC UTILITY | : | |
| COMMISSION, | : | |
| | : | |
| Appellees | : | |


| | | |
|---|---|---|
| PPL ELECTRIC UTILITIES CORPORATION, | : | No. 57 MAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court dated |
| | : | September 22, 2017, exited |
| v. | : | September 25, 2017, |
| | : | at No. 462 MD 2013. |
| | : | |
| CITY OF LANCASTER AND | : | ARGUED: March 5, 2019 |
| PENNSYLVANIA PUBLIC UTILITY | : | |
| COMMISSION | : | |
| | : | |
| CROSS-APPEAL OF: CITY OF | : | |
| LANCASTER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

JUSTICE WECHT                                    DECIDED:  August 20, 2019

The regulation of public utilities[1] long has been entrusted to state law. Pennsylvania's Public Utilities Code ("the Code")[2] confers administrative and regulatory authority upon the Pennsylvania Public Utilities Commission (the "PUC").  In the case at hand, the City of Lancaster ("the City") enacted a measure ("Ordinance 16-2013" or "the Ordinance") that sought to superimpose municipal requirements upon state-regulated utilities that use the City's rights-of-way to deliver services.  PPL Electric Utilities Corp. ("PPL") challenged the Ordinance, contending, *inter alia*, that it intruded upon, and thus was preempted by, the Code.  The Commonwealth Court largely agreed, upholding PPL's challenge with regard to all but one of the challenged provisions of the Ordinance.  The provision that the Commonwealth Court upheld authorized the City to impose an "annual occupancy fee" upon utilities that utilize its municipal rights-of-way.  We hold that all of the provisions challenged by PPL, including the annual occupancy fee, are preempted by the Code.  Accordingly, we affirm the Commonwealth Court's decision except with respect to its allowance for the annual occupancy fee, which latter ruling we reverse.

### I.    Background

On December 17, 2013, the City, a home rule municipality pursuant to the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. §§ 2901-3171 (hereinafter, "the

---

[1]      "Public utility" is defined at 66 Pa.C.S. § 102.

[2]      *See* Act of July 1, 1978, P.L. 598, No. 116 (as amended), 66 Pa.C.S. §§ 101-3316.

HRC"),[3] enacted Ordinance 16-2013, which implemented a comprehensive program for management of the City's rights-of-way. The Ordinance granted the City certain powers over, and concomitantly imposed correlative burdens upon, utilities, including the imposition of an annual occupancy (or "maintenance"[4]) fee. The City cited as authority for its Ordinance the powers putatively conferred upon it by the Third Class City Code ("TCCC"), 53 P.S. §§ 35101-39701,[5] and the HRC.

Several Ordinance provisions are at issue. Section 263B-3 authorizes the City to conduct inspections to confirm that utility facilities comply with Code and PUC standards and do not present safety hazards. Section 263B-4(6) permits the City to direct a utility to temporarily or permanently remove, relocate, or reposition utility facilities in the right-of-way for various purposes, including repair, maintenance, installation of public improvements, or in case of emergency. Section 263D-1 authorizes the City to impose penalties for a utility's violation of any provision of the Ordinance that does not lie in the PUC's exclusive jurisdiction. Finally, Section 263B-5 permits the City to impose the aforesaid maintenance fee upon utilities for the occupancy and use of its rights-of-way.[6]

---

[3]     *See* Act of Dec. 19, 1996, P.L. 1158, No. 177 (as amended).

[4]     The parties and the Commonwealth Court adopted the "maintenance fee" terminology, and we do the same for ease of reference

[5]     These citations for the Third Class City Code are no longer current. Effective January 25, 2016, the TCCC was repealed and replaced by the Act of Nov. 24, 2015, P.L. 242, No. 67, and renumbered 11 Pa.C.S. §§ 10101, *et seq.* The recodification and renumbering are immaterial to our analysis.

[6]     The relevant sections of the Ordinance text are reproduced at length below in Section II.C.

On February 4, 2014, PPL filed a petition for review in the Commonwealth Court's original jurisdiction, seeking declaratory and injunctive relief against the City and, nominally, the PUC, which is substantively aligned with PPL. PPL, a utility regulated by the PUC under the Code, contended that the Code reflects the legislature's intention to impose a uniform, statewide regulatory scheme governing public utilities and their facilities, and vests exclusive regulatory authority in the PUC. On PPL's account, the PUC's authority extends to the location, construction, and maintenance of utility facilities, provides for the only tariff that may be imposed upon a public utility, and specifies the means of the PUC's exclusive oversight of Code and regulatory compliance. PPL also argued that the City exceeded its authority under the Municipalities Planning Code, 53 P.S. §§ 10101-11202,[7] and the Business Corporation Law of 1988 ("BCL"), 15 Pa.C.S. §§ 1101-4146.[8]

The City filed preliminary objections in the nature of a demurrer. It contended that the Ordinance was duly enacted and consistent with its police powers. The Commonwealth Court, noting that "municipalities have no inherent powers; they possess only such powers of government as are expressly granted to them by the legislature and are necessary to carry out the same," overruled the preliminary objections and directed the City to answer PPL's Petition. *PPL v. City of Lancaster*, 462 M.D. 2013, slip. op. at 9 (Pa. Cmwlth. May 1, 2014) (citing *Hoffman Mining Co., Inc. v. Zoning Hearing Bd. of Adams Twp.*, 32 A.3d 587 (Pa. 2011)).

---

[7]     *See* Act of July 31, 1968, P.L. 805, No. 247 (as amended).

[8]     *See* Act of Dec. 21, 1988, P.L. 1444, No. 177 (as amended).

After further pleading, PPL filed an application for summary relief,[9] seeking judgment in its favor with regard to Counts I, II, III, and V of its Petition, embodying, respectively, PPL's challenges to Section 263B-5's maintenance fee; Section 263B-3's inspection requirements; Section 263D-1's parallel enforcement authority for Code violations; and Section 263B-6's relocation and removal provisions, all on the basis that they are impliedly preempted by the Code.

The Commonwealth Court, sitting *en banc*, entered judgment in PPL's favor and against the City with respect to Counts II, III, and V, but denied relief as to Count I, upholding the City's authority to impose the maintenance fee. *See PPL Elec. Utils. Corp. v. City of Lancaster*, 125 A.3d 837, 853 (Pa. Cmwlth. 2015) (*en banc*) (hereinafter "*PPL*").

The court began by reviewing principles of state-law preemption of local law-making authority. "[E]ven in areas over which municipalities have been granted power to act," the court explained, "the state may bar local governing bodies from legislating in a particular field." *Id.* at 844 (quoting *Hoffman Mining Co.*, 32 A.3d at 593). Preemption takes three forms: express preemption, conflict preemption, and field preemption. *See generally Hoffman Mining Co.*, 32 A.3d at 593-94.

The court then considered the PUC's sweeping authority under state law. It noted that the General Assembly has sought to ensure that utilities are bound to a uniform, statewide regulatory scheme rather than a crazy quilt of local regulations, a principle this Court recognized over a century ago under the Code's predecessor statute. *See York Water Co. v. York*, 95 A. 396, 397 (Pa. 1915) ("The Public Service Company Law was

---

[9] "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008).

intended to establish a complete and uniform system throughout the state for the enforcement of such powers as were conferred upon the Public Service Commission by that statute.").[10] Thus, in *Duquesne Light Co. v. Upper St. Clair Township*, 105 A.2d 287 (Pa. 1954) (hereinafter "*Upper St. Clair*"), the Township sought by ordinance to block a utility from exercising the power of eminent domain the General Assembly had granted it to condemn property for a new transmission line. The Court of Common Pleas granted the utility injunctive relief from the effect of the ordinance. This Court affirmed, citing the PUC's statutory authority to "supervise and regulate all public utilities doing business within this Commonwealth," and holding that the then-applicable Public Utility Code "excluded townships from the same field" as that governed by the Code. The Court elaborated as follows:

> The [Code] demonstrates without question that the Legislature of the Commonwealth of Pennsylvania has therein expressed its policy to commit the regulation of utilities to the [PUC] . . . . We believe that this is the reason why the General Assembly entrusted the regulation of public utilities to a commission of statewide jurisdiction. Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important, those authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference. We believe that the General Assembly never intended to bestow a power upon first class townships which is in headlong conflict with the power already given the [PUC].

*Id.* at 293. This Court reaffirmed this principle in *County of Chester v. Philadelphia Electric Co.*, 218 A.2d 331 (Pa. 1966) (hereinafter "*Philadelphia Electric*"), rejecting a

---

[10]    Originating in the Public Service Company Law of 1913, Act of July 26, 1913, P.L. 1374, statewide utility regulation later was governed by the Public Utility Law of 1937, Act of May 28, 1937, P.L. 1053, followed by the current Code, enacted in 1978.

county ordinance that prohibited construction of pipelines without approval of the county's planning commission.

The Commonwealth Court also cited several of its own more recent decisions to the same effect. In doing so, the court introduced a separate statutory provision at issue in this case, Section 1511(e) of the BCL, which provides in relevant part:

> A public utility corporation shall have the right to enter upon and occupy streets, highways, waters and other public ways and places for one or more of the principal purposes specified in subsection (a)[11] and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes, including the placement, maintenance and removal of aerial, surface and subsurface public utility facilities thereon or therein. Before entering upon any street, highway or other public way, the public utility corporation shall obtain such permits as may be required by law and shall comply with the lawful and reasonable regulations of the governmental authority having responsibility for the maintenance thereof.

15 Pa.C.S. § 1511(e). The City relied upon this provision for its proviso that utilities must comply with "the lawful and reasonable regulations" of the municipalities that maintain the rights-of-way.

The Commonwealth Court then turned to the Ordinance provisions at hand. Against precedent suggesting broad preemption against local regulation of utilities' use of local rights-of-way, the City counterposed the "reasonable regulations" caveat in BCL § 1511(e), as well as Section 1991 of the General Municipal Law,[12] which provides that a municipal authority "shall have the right to issue permits determining the manner in which

---

[11]     Section 1511(a)(2) confers upon a public utility corporation the right to "take, occupy and condemn property" for "[t]he transportation of . . . electricity . . . for the public." 15 Pa.C.S. § 1511(a)(2).

[12]     *See* Act of June 25, 1895, P.L. 275 (as amended), 53 P.S. §§ 101-11703.8.

public service corporations or individuals shall place, on or under or over such municipal streets or alleys, railway tracks, pipes, conduits, [or] telegraph lines." 53 P.S. § 1991.

The Commonwealth Court rejected the City's argument that these provisions vest municipalities with the authority "to enact ordinances regulating public utilities." *PPL*, 125 A.3d at 849. In particular, the court noted that the TCCC provided that "[n]othing contained in [the TCCC] shall be construed to repeal any local or special laws; or to repeal the provisions of the [Code]." *Id.* at 849-50 (quoting 53 P.S. § 39701).[13] The court further noted that the Ordinance's provisions "implicate subjects, including the inspection and location of utility facilities and the imposition of fees and penalties, that are committed to the PUC's exclusive jurisdiction by the Code." *Id.* at 850.

With regard to Section 263B-3, which authorizes the City to inspect public utilities' facilities for compliance with PUC standards, the court agreed with PPL that the provision "essentially makes the City a regulator itself." *Id.* Such regulation conflicts with Section 2802(20) of the Code, which expressly provides that "the independent system operator or its functional equivalent should set, and the commission shall set through regulations, inspection, maintenance, repair and replacement standards *and enforce those standards*." 66 Pa.C.S. § 2802(20) (emphasis added). The Code further grants the PUC the authority to appoint inspectors to oversee and investigate compliance in furtherance of Code enforcement. *See id.* §§ 305(c), 307 (designating PUC-employed

---

[13] The same principle now is embodied in 11 Pa.C.S. § 12445(b), which subjects the right-of-way powers granted to municipalities "to the power of the [PUC under the Code] to regulate the business, facilities and service of public utilities, including determining the location of installation of utility facilities." *Cf. Id.* § 14702(5) (providing that nothing in the TCCC shall be construed to repeal "[t]he provisions of 66 Pa.C.S. Pt. I (relating to Public Utility Code)").

inspectors "police officers" with commensurate statewide authority), 331 ("Powers of commission and administrative law judges"), 506 ("Inspection of facilities and records").[14]

Concerning Section 263B-4(6), which would grant the City power to order a utility to remove, relocate, or reposition utility facilities when the City determines that it is "reasonably necessary," the court again turned to our holding in *Philadelphia Electric* that "the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities." *PPL*, 125 A.3d at 850 (quoting *Phila. Elec.*, 218 A.2d at 333). The court noted that Code § 1505(a) expressly grants the PUC the power to identify and direct remediation of utility facilities that it finds to be "unreasonable, unsafe, inadequate, insufficient, . . . or otherwise in violation of" the Code. 66 Pa.C.S. § 1505(a). The court further noted that the PUC has promulgated regulations relating to the location of electric transmission facilities. *See PPL*, 125 A.3d at 851 (citing 52 Pa.

---

[14]    The authority conferred upon the PUC by Code § 506 is strikingly broad:

> The [PUC] shall have full power and authority, either by or through its members, or duly authorized representatives, whenever it shall deem it necessary or proper in carrying out any of the provisions of, or its duties under this part, to enter upon the premises, buildings, machinery, system, plant, and equipment, and make any inspection, valuation, physical examination, inquiry, or investigation of any and all plant and equipment, facilities, property, and pertinent records, books, papers, accounts, maps, inventories, appraisals, valuations, memoranda, documents, or effects whatsoever, of any public utility, or prepared or kept for it by others, and to hold any hearing for such purposes. In the performance of such duties, the [PUC] may have access to, and use any books, records, or documents in the possession of, any department, board, or commission of the Commonwealth, or any political subdivision thereof.

66 Pa.C.S. § 506.

Code §§ 57.19, 57.71-57.77, 57.81-57.88, 69.3101, 69.3107[15]).  The court acknowledged the City's own caveat in the Ordinance that its provisions allow for "relocat[ion] and remov[al of] Facilities consistent with the regulations and standards of the PUC," Ordinance § 263B-4(6), but found that, as with Section 263B-3, this directive only made the City a co-regulator with authority overlapping with, or redundant to, that expressly granted the PUC by the General Assembly.  *PPL*, 125 A.3d at 851.

Section 263D-1 would authorize the City, *inter alia*, to bring a complaint against a public utility for violation of "a PUC regulation, standard, or order."  *Id.* at 852 (quoting Ordinance § 263D-1(a)).  It further grants the City authority to impose a fine for any violation of any Ordinance provision that lies outside the PUC's exclusive jurisdiction. This, too, the court found preempted as "an overlapping enforcement regime for public utilities."  *Id.*  Again citing 66 Pa.C.S. § 1505, the court noted that the Code authorizes the PUC to police and direct remediation of violations of the Code and PUC regulations, and further authorizes, at 66 Pa.C.S. § 3301, an action in assumpsit brought in the name of the Commonwealth to recover fines.  To that end, the PUC has promulgated regulations setting forth its own investigative and enforcement apparatus, including factors and standards to guide the imposition of penalties and approval of settlements.  *PPL*, 125

---

[15]    All of these regulations concern application, siting, and installation of new service lines and extensions.  Also relevant, however, are 66 Pa.C.S. §§ 301, *et seq.* (establishing the PUC and providing for commissioners, inspectors, administrative law judges, etc.); 506, *supra* n.15; 1501 ("Character of service and facilities," requiring utilities to maintain "safe" facilities and perform service necessary to preserve that state, consistently with PUC regulations, and providing for enforcement); *see also* 52 Pa. Code §§ 57.11 (concerning mandatory reporting of qualifying ("reportable") accidents involving "the facilities or operations of the public utility"), 57.12 (directing a public utility to promptly investigate customer complaints), and 57.28 (prescribing minimum safety requirements and providing for inspections and noncriminal investigations of, *inter alia*, utility facilities "to assure compliance").

A.3d at 852-53 (citing 52 Pa.Code §§ 57.197 ("Reliability investigations and enforcement"), 69.1201 ("Factors and standards for evaluating litigated and settled proceedings involving violations of the . . . Code and [PUC] regulations")). The court considered and rejected the City's reliance upon the Ordinance's caveat extending this enforcement authority only to areas over which the PUC does not have exclusive authority, noting that this did not vitiate the usurpation of exclusive PUC authority implicated in allowing the City to approach utilities directly concerning "the City's perceived violations of the Code or the PUC's regulations or orders," *id.* at 853, which again postured the City as a concurrent utility regulator in contravention of the Code's uniform system.

With regard to Section 263B-5, which would authorize the City to impose an annual maintenance fee on public utilities with facilities in City rights-of-way, PPL argued that the fee was redundant with, and precluded by, the annual assessment fee that the PUC calculates and imposes pursuant to the Code for regulatory expenses. *See* 66 Pa.C.S. § 510 ("Assessment for regulatory expenses upon public utilities" in service of the "intent and purpose . . . that each public utility subject to this part shall advance to the commission its reasonable share of the cost of administering this part"). The court observed that the maintenance fee concerned burdens separate from those purportedly offset by the PUC's annual fee—specifically, the costs the City expends to maintain its rights-of-way, which are not accounted for by the Code. Noting that this Court has recognized that maintaining rights-of-way is among traditional municipal police powers, *PPL*, 125 A.3d at 851 (citing *Adams v. New Kensington*, 55 A.2d 392, 394-95 (Pa. 1947); *Kittanning Borough v. Am. Nat. Gas Co.*, 86 A. 717, 717-18 (Pa. 1913)), the

Commonwealth Court thus held that imposing fees to offset locally-incurred maintenance expenses does not constitute impermissible regulation of public utilities. Rather, the City has "the legal ability to assess fees for recovery of costs under its home rule powers" because "the Code does not preempt the imposition" of such an annual fee, provided that the fee is "reasonable in relation to the costs incurred by the City." *Id.*

For these reasons, the court granted judgment in favor of PPL on its claims against every challenged provision of Ordinance 16-2013 except Section 263B-5, which the court determined was an authorized exercise of the City's home-rule authority to seek reasonable compensation for maintenance expenses associated with rights-of-way utilized by utilities.[16]

By separate order entered on September 22, 2017, the court noted that the parties had stipulated to the discontinuance of Count IV, which had been left unresolved by the 2015 ruling, and entered judgment in favor of the City on the maintenance fees, thus adjudicating all claims as to all parties and ripening the case for appellate review. The City and PPL both appealed to this Court, raising the following issues, which we have reordered to reflect the sequence in which we address them:

*By City of Lancaster*

Whether Commonwealth Court erred as a matter of law in granting summary relief to PPL invalidating Sections 263B-3, 263B-4(6), and 263D-1 of [the Ordinance], where the express language of these sections neither conflicts with the jurisdiction of the [PUC] nor interferes with PPL's rights under Section 1511(e) of the [BCL]?

Brief for the City at 5.

---

[16] President Judge Pellegrini dissented, joined by Judge McGinley, indicating that he would have deemed none of the challenged provisions preempted. Judge Leadbetter noted her dissent without opinion to the court's maintenance fee ruling.

*By PPL Electric Utilities Corp. and the PUC (as stated by PPL Electric Utilities Corp.)*

Whether the General Assembly's statutory purpose of ensuring reasonable utility rates for consumers across the Commonwealth through the uniform, statewide regulation of rates by the PUC pursuant to the . . . Code preempts a municipality's perpetual, annual occupancy fee on public utilities' facilities in the right-of-way?

Brief for PPL at 5.[17]

## II.     Discussion[18]

### A.     Statutory Interpretation and the Three Varieties of Preemption

The case before us raises questions of state law preemption, which require us to interpret the allegedly preemptive state statutory regime. Statutory interpretation presents a question of law that we consider *de novo*, and the scope of our review is plenary. *Nutter v. Dougherty*, 938 A.2d 401, 412 n.20 (Pa. 2007). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). Thus, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). In ascertaining the General Assembly's intent, we may presume, *inter alia*, "[t]hat the General Assembly intends the entire statute to be effective and certain." *Id.* § 1922(2). We also may presume "[t]hat when a court of last resort has construed the language used in a statute, the General Assembly in subsequent

---

[17]     PPL asserts two other bases upon which the maintenance fee should be set aside. In light of our holding that the maintenance fee is preempted, we need not consider the merits of PPL's other arguments.

[18]     Where there are no disputed issues of material fact, whether summary relief was appropriately rendered presents a question of law as to which our review is plenary. *Jubelirer v. Rendell*, 953 A.2d at 521.

statutes on the same subject matter intends the same construction to be placed upon such language." *Id.* § 1922(4). Commensurately, when the legislature declines to amend a statute in contravention of this Court's prior interpretation of the statute, we may presume that our prior interpretation was and remains consistent with legislative intent. *See Commonwealth v. Lassiter*, 722 A.2d 657, 661 n.3 (Pa. 1998); *Commonwealth v. Wanamaker*, 296 A.2d 618, 624 (Pa. 1972).

The questions presented concern whether and to what extent the General Assembly intended to preempt the sorts of local regulations of public utilities that the City enacted in this case. Contemporary expressions of the three varieties of preemption are legion, and they distill reams of case law to the proposition that preemption may occur when the legislature has expressly stated its intention to displace local regulation ("express preemption"), or has occupied the regulatory field in question ("field preemption"), or, finally, where the local regulation would conflict with or confound rather than advance the operation of the state law in question ("conflict preemption"). *See generally Nutter*, 938 A.2d at 404, 411-12.

This Court has explained:

In a landmark case, *Western Pennsylvania Restaurant Association v. City of Pittsburgh*, 77 A.2d 616, 619 (Pa. 1951), this Court . . . enunciated the appropriate criteria for determining whether the Commonwealth, to the exclusion of its political subdivisions, has preempted by legislation the regulation of certain activities: There are statutes which expressly provide that nothing contained therein should be construed as prohibiting municipalities from adopting appropriate ordinances, not inconsistent with the provisions of the act or the rules and regulations adopted thereunder, as might be deemed necessary to promote the purpose of the legislation. On the other hand there are statutes which expressly provide that municipal legislation in regard to the subject covered by the state act is forbidden. Then there is a third class of statutes which, regulating some industry or occupation, are silent as to whether municipalities are or are not permitted to enact supplementary legislation or to impinge in any manner upon the

field entered upon by the state; in such cases the question whether municipal action is permissible must be determined by an analysis of the provisions of the act itself in order to ascertain the probable intention of the legislature in that regard. It is of course self-evident that a municipal ordinance cannot be sustained to the extent that it is contradictory to, or inconsistent with, a state statute. Municipalities in the exercise of the police power may regulate certain occupations by imposing restrictions which are in addition to, and not in conflict with, statutory regulations. But if the general tenor of the statute indicates an intention on the part of the legislature that it should not be supplemented by municipal bodies, that intention must be given effect and the attempted local legislation held invalid. In *Department of Licenses and Inspections v. Weber*, 147 A.2d 326, 327 (Pa. 1959), Mr. Justice Musmanno, speaking for this Court said: 'Of course, it is obvious that where a statute specifically declares it has planted the flag of preemption in a field, all ordinances on the subject die away as if they did not exist. It is also apparent that, even if the statute is silent on supersession, but proclaims a course of regulation and control which brooks no municipal intervention, all ordinances touching the topic of exclusive control fade away into the limbo of 'innocuous desuetude.' However, where the Act is silent as to monopolistic domination and a municipal ordinance provides for a localized procedure which furthers the salutary scope of the Act, the ordinance is welcomed as an ally, bringing reinforcements into the field of attainment of the statute's objectives.

*Harris-Walsh, Inc. v. Borough of Dickson City*, 216 A.2d 329, 333-34 (Pa. 1966) (cleaned up[19]).

---

[19] The author has elected here to adopt the "cleaned up" parenthetical for certain quotations, an increasingly common practice in judicial decisions across the country, and one employed by our Pennsylvania Superior Court. *See Commonwealth v. Kehr*, 180 A.3d 754 (Pa. Super. 2018). One commentator has explained the practice as follows:

Using (*cleaned up*) indicates that in quoting a court's decision the author—

- has removed extraneous, non-substantive material like brackets, quotation marks, ellipses, footnote reference numbers, and internal citations;

- may have changed capitalization without using brackets to indicate that change; and

In *Hoffman Mining Co*, we elaborated specifically upon field preemption:

> The mere fact that the General Assembly has enacted legislation in a field does not lead to the presumption that the state has precluded all local enactments in that field; rather the General Assembly must clearly evidence its intent to preempt. Such clarity is mandated because of the severity of the consequences of a determination of preemption: If the General Assembly has preempted a field, the state has retained all regulatory and legislative power for itself and no local legislation in that area is permitted.

*Hoffman Mining Co.*, 32 A.3d at 593 (cleaned up).

### B.    Prior Decisions Concerning Utilities Regulation and Preemption

To situate the above principles in the context of utilities regulation, we must review the cases upon which the lower court and the parties principally rely. Arguably, we need look no farther than our decision in *Philadelphia Electric*, in which we upheld a utility's challenge to a county ordinance prohibiting any person or corporation from constructing a pipeline in the county without first submitting to the county plans and specifications for the pipeline, including an onerous array of enumerated disclosures and "such other information relating to the project as the . . . Planning Commission shall deem relevant." *Philadelphia Electric*, 218 A.2d at 332. The Court emphatically rejected the ordinance:

> The State, speaking through the Public Utility Law . . . has given the [PUC] all-embracive regulatory jurisdiction over companies such as the defendant company in this case. In *Borough of Lansdale v. Philadelphia Electric Co.*, 170 A.2d 565 (Pa. 1961), this Court held:

---

- • affirmatively represents that the alterations were made solely to enhance readability and that the quotation otherwise faithfully reproduces the quoted text.

Jack Metzler, *Cleaning Up Quotations*, 18 J. APP. PRAC. & PROCESS 143 (2017). To this list one might add modifications to internal citation format for purposes of consistency with the balance of the opinion. The practice has been endorsed by such legal eminences as Bryan Garner and Professor Eugene Volokh, and the benefits for purposes of readability (particularly in a lengthy quotation) are apparent.

No principle has become more firmly established in Pennsylvania law than that the courts will not originally adjudicate matters within the jurisdiction of the PUC. Initial jurisdiction in matters concerning the relationship between public utilities and the public is in the PUC—not in the courts. It has been so held involving rates, service, rules of service, extension and expansion, hazard to public safety due to use of utility facilities, installation of utility facilities, location of utility facilities, obtaining, alerting, dissolving, abandoning, selling or transferring any right, power, privilege, service franchise or property and rights to serve particular territory.

This reasoning is irrefutable. The necessity for conformity in the regulation and control of public utilities is as apparent as the electric lines which one views traversing the Commonwealth. If each county were to pronounce its own regulation and control over electric wires, pipe lines and oil lines, the conveyors of power and fuel could become so twisted and knotted as to affect adversely the welfare of the entire state. It is for that reason that the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities. *Einhorn v. Phila. Elec. Co.*, 190 A.2d 569 (Pa. 1963); *Upper St. Clair*, 105 A.2d 287; *Lower Chichester Twp. v. PUC*, 119 A.2d 674 (Pa. Super. 1956).

The provisions of the Public Utility Law, cited above, and more specifically [eleven cited sections], together with accompanying regulations of the [PUC], have designed and developed the machinery which standardizes the construction, operation and services of public utilities throughout Pennsylvania.

As stated by the court below, if the County of Chester and its Board of Commissioners believe that this machinery somehow impairs public utilities services in Chester County or works to the harm of the inhabitants of Chester County, their remedy resides in asking the [PUC] to provide regulations which will protect Chester County or they may apply directly to the Legislature for necessary Amendments to the Public Utility Law. It may not, however, of its own volition throw a monkey wrench into that machinery with the thought that this may remedy a defect in the statewide mechanism.

*Id.* at 332-33 (cleaned up).

Similar authority dates back over a century. In *York Water Co.*, relying upon a provision of the then-applicable incarnation of the TCCC that purported to authorize cities to regulate the measuring of commodities sold in the city, the City of York enacted an ordinance requiring water providers to install meters for subscribers at the provider's

expense. *See York Water Co.*, 95 A. at 396. Against this grant of authority, the Court considered the effect of the Public Service Company Law ("PSCL"), the Code's early ancestor. The PSCL subjected "public service corporations," including appellee York Water, "to the control and supervision of the Public Service Commission," the PUC's predecessor, providing "that all former acts or parts of acts inconsistent [with the law] were repealed" by that law. *Id.* at 396-97. The Court found that the PSCL, having been enacted after York's ordinance, expressly repealed it. The *York Water* Court also observed that the PSCL "was intended to provide a complete system for the supervision and regulation of public service corporations." *Id.* at 397. Thus, "even if the act did not so provide in express terms it would operate as a repeal of former statutes inconsistent with its provisions," invoking field preemption as a basis for decision. *Id.*

In *Upper St. Clair*, the utility challenged a municipal ordinance that interfered with its erecting transmission lines across the township. In order to facilitate its construction, the utility was required to purchase or condemn easements and rights-of-way in areas that were zoned residential. The PUC found that the transmission line "was necessary and proper for the service, accommodation, convenience or safety of the public," and issued "certificates of public convenience" that enabled the utility to obtain the necessary property interests. *Upper St. Clair*, 105 A.2d at 289. However, when the utility commenced construction in the township, a police officer served notice directing the contractor to cease construction and seek a township building permit. The utility sought injunctive relief.

The lower court granted the utility leave to continue construction, and the township appealed. This Court reaffirmed the sweeping regulatory authority conferred upon the

PUC by the Code, including its authority to ensure that utilities provide adequate facilities in their service area and to impose substantial civil and criminal penalties for failure to do so. It noted that the First Class Township Law of 1931 had specified that the act "should not repeal or modify any of the provisions of the [PSCL]," and upon its later amendment in 1949, twelve years after enactment of the Public Utility Law of 1937, which then applied, the First Class Township Law again provided that it was not to "repeal or modify any of the provisions of" that law. *Id.* at 291. The Court concluded "that the policy of the Commonwealth in entrusting to the [PUC] the regulation and supervision of public utilities has excluded townships from the same field" absent an express state law to the contrary. *Id.* at 292. "If the power of the municipality were held paramount," the Court added, "the [PUC] could not compel the utility to provide adequate service or in anywise control the expansion or extension of the utility's facilities," which "would mean the complete negation of the powers of regulation and control specifically given as a matter of public policy to the [PUC] in the interest of state-wide public welfare." *Id.* at 293.

Interestingly, in *Duquesne Light Co. v. Borough of Monroeville*, 298 A.2d 252 (Pa. 1972) ("Borough of Monroeville"), this Court held that aspects of municipal authority over a utility's use of the borough's rights-of-way could be regulated simultaneously by state and local provisions, provided that the PUC had the final word. In that case, the borough enacted an ordinance creating an underground wire district, which required both that new electric facilities and preexisting ones be placed underground. Importantly, the authority to enact the ordinance was found in an express provision of the then-effective Pennsylvania Borough Code allowing boroughs to define "a reasonable district within which electric light, electric power, telephone, telegraph and other types of wires shall be

placed underground in conduits." *Id.* at 255. Nevertheless, the utility contended that the ordinance was preempted by the Code.

This Court noted that the Borough Code provision in question repeatedly had been amended and reenacted, including twice after the enactment of the then-effective 1937 Code. Consequently, the Court found no basis to conclude that the General Assembly intended entirely to preempt the borough's authority in this regard. In seeking to give effect to both the Code and the Borough Code, the Court held that, "although the borough may define reasonable underground wiring districts, the [PUC] has the ultimate authority to determine the particulars of implementation, including timing, feasibility and cost of the project." *Id.* at 256. The Court found additional support for this interpretation, including PUC's primacy in governing the details of implementation, in the Borough Code's provision that "nothing contained in this act shall be construed to repeal . . . [a]ny of the provisions of the Public Utility Law." *Id.* Ultimately, the Court held that, "[a]lthough the Borough of Monroeville does have the power to define reasonable underground wiring districts, implementation can only be achieved through [PUC] action." *Id.* at 257.[20]

### C.    Analysis of the Challenged Ordinance Provisions

In light of the above case law, and absent a compelling argument to the contrary, we reaffirm that the General Assembly long has intended, and continues to intend, that its comprehensive statutory framework for utility regulation, as complemented by the PUC's voluminous complementary regulations, reflect its general intention wholly to

---

[20]    Relatedly, this Court repeatedly has declined original judicial jurisdiction in favor of PUC's primary role in receiving and adjudicating disputes concerning utility regulation. *See Behrend v. Bell Tel. Co.*, 243 A.2d 346 (Pa. 1968); *Borough of Lansdale*, 170 A.2d 565.

occupy the field of utility regulation at the state level. The importance of "conformity in the regulation and control of public utilities" identified in *Philadelphia Electric* as well as the risks associated with allowing various local authorities to impose municipality-specific burdens upon utilities are no less germane now than they were then. To embark now upon a divergent approach would be to depart from the sound reasoning of long-standing case law, concomitantly discarding the equally sound inference that the General Assembly has, for a century and through three incarnations of public utility code, intended to preserve the preemptive thrust of that case law. *See Lassiter; Wannamaker*, *supra*.

### 1. The City's Appeal [21]

Nonetheless, the City insists that the Commonwealth Court was bound "to apply a conflict preemption analysis in accordance with principles established by this Court." Brief for the City at 24. The City cites *Hoffman Mining Co.* for the proposition that only where conflict with a state statute is "irreconcilable" will a court find local regulation preempted by virtue of conflict. Absent such conflict, a municipality "may make such additional regulations in aid and furtherance of the purpose of the general [state] law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable." *Hoffman Mining Co.*, 32 A.3d at 595.

The City notes that no provision in the Ordinance prevents public utilities from entering the City's rights-of-way freely, as required by the BCL. *See* 15 Pa.C.S. § 1511(e). Moreover, even if the City discovers a Code violation, its only remedies are to

---

[21] The City's position is supported by a joint brief submitted by *Amici Curiae* The Pennsylvania Municipal League, The Pennsylvania Association of Township Supervisors, and the Pennsylvania State Association of Township Commissioners.

request voluntary abatement of the violation or file a formal complaint with PUC, the latter of which already is authorized by statute. *See* 66 Pa.C.S. § 701.[22] Conversely, the City argues, the cases relied upon by PPL and PUC involved local laws requiring utilities to undertake affirmative acts imposing directly upon overlapping PUC regulations. *See York Water Co.*, 95 A. 396 (requiring installation of water meters at utility's expense); *Pa. Power Co. v. Twp. of Pine*, 926 A.2d 1241 (Pa. Cmwlth. 2007) (ordering utility to place lines underground); *PECO Energy Co. v. Twp. of Upper Dublin*, 922 A.2d 996 (Pa. Cmwlth. 2007) (regarding vegetation management around utility facilities). The City argues that "Ordinance 16-2013 does not require PPL to do anything that would fall within the purview of a PUC rule or regulation. Where a PUC rule or regulation applies, Ordinance 16-2013 specifically defers to the PUC-imposed requirement." Brief for the City at 32.

With respect to Section 263B-3 ("Right to inspect"),[23] the City argues that inspections merely "ensure that Utility Facilities located within such Rights-of-Way do not

---

[22]     Section 701, provides that "any person, corporation, or municipal corporation . . . may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission." 66 Pa.C.S. § 701.

[23]     Section 263B-3 provides:

The City may conduct inspections of the City Rights-of-Way in order to ensure that Utility Facilities located within such Rights-of-Way do not constitute a public safety hazard, and remain in compliance with the standards set forth by the [PUC]. Such inspections shall be limited to establishing whether such Facilities meet relevant PUC standards, and comply with such City construction standards as relate to the opening and closing of City streets, curbs, and sidewalks, as provided under 15 Pa.C.S. § 1511(e). In the event that the City determines that any Facilities of a Utility are not in compliance with such standards, then the City may bring a

constitute a public safety hazard, and remain in compliance with the standards set forth by the [PUC]," and are "limited to establishing whether such Facilities meet relevant PUC standards, and comply with such City construction standards as relate to the opening and closing of City streets, curbs, and sidewalks as provided under 15 Pa.C.S. § 1511(e)." Brief for the City at 34.

The City makes a similar argument with respect to Ordinance Section 263B-4(6) ("Relocation or removal of facilities"),[24] which authorizes the City to direct the temporary or permanent removal, relocation, or repositioning of a public utility facility. This provision, too, limits local authority by providing that it exists only where "consistent with applicable

---

complaint against such Utility before the [PUC], in accordance with established PUC procedures. The City may also elect, in its discretion, to notify the Utility of the existence of any non-compliant Facilities, in order to abate such violations without the need for the filing of a formal PUC complaint.

Ordinance 16-2013 § 263B-3.

[24] Section 263B-4(6) provides:

*Relocation or Removal of Facilities.* Within sixty (60) days following written notice from the City, or such longer period as the City determines is reasonably necessary or such shorter period in the case of an Emergency, a Utility shall temporarily or permanently remove, relocate, change or alter the position of any Facilities within the Right-of-Way, excluding those underground, whenever the City, consistent with applicable PUC regulations, shall have determined that such removal, relocation, change or alteration is reasonably necessary under the following circumstances: the construction, repair, maintenance, or installation of any City or other public improvement in the Right-of-Way; the operations of the City or other governmental entity in the Right-of-Way; vacation of a Street or the release of a utility easement; or an Emergency as determined by the City. Utilities must relocate and remove Facilities consistent with the regulations and standards of the PUC.

Ordinance 16-2013 § 263B-4(6).

PUC regulations."  Thus, maintains the City, the Commonwealth Court erred in concluding that applying the Ordinance interfered with the PUC's enforcement of the Code and its regulations, given the provision's own caveat that relocation or removal be effectuated "consistent with the regulations and standards of the PUC."  *See* Ordinance 16-2013 § 263B-4(6).

Similarly, in finding Section 263D-1 ("Penalties")[25] preempted, the City argues, the court again overlooked that nothing in that provision conflicted with or deviated from, the Code's correlative provisions.  In matters that lie in PUC's exclusive jurisdiction,

---

[25]     Section 263D-1 provides, in relevant part:

(a)  *PUC Regulated Utilities*.  In the event a public utility is found by the City to have violated a PUC regulation, standard, or order, then the City may bring a complaint against such public utility before the [PUC] for violation of such regulation, standard, or order.  The City may also notify the Utility of the existence of any suspected violation of PUC standards, regulations or order in order to obtain compliance by the Utility.

In the event a public utility is found to have violated any other provision of this Chapter that is not within the exclusive jurisdiction of the PUC, then such public utility shall be subject, upon conviction thereof, to a fine not exceeding three hundred dollars ($300), for each and every offense, together with attorneys' fees and costs, and in default of the payment thereof, imprisonment for not more than ninety (90) days.  A separate and distinct violation shall be deemed to be committed each day on which a violation occurs or continues to occur.  In addition to an action to enforce any penalty imposed by this Chapter and any other remedy at law or in equity under this Title, the City may apply to a Court of Common Pleas for an injunction or other appropriate relief at law or in equity to enforce compliance with or restrain violation of any provision of this Chapter which is not subject to the exclusive jurisdiction of the PUC.

Nothing in this Section shall be construed to permit the City to commence or attempt to commence prosecution of any PUC Regulated Utility for a violation of any regulation, standard or order of the PUC.

Ordinance 16-2013 § 263D-1(a).

Section 263D-1 only authorizes the City to seek voluntary compliance and/or file a complaint with the PUC. To the extent that the provision authorizes the City to enforce the Ordinance, it does so only with regard to requirements that do not conflict with the Code.

In response, PPL[26] contests the City's account of the standard governing conflict preemption. PPL argues that "the Ordinance is not preempted because the City tells a utility to go up, while the PUC tells the utility to do down; it is preempted because the General Assembly reserved to the PUC the exclusive authority to give direction to public utilities." Second Brief for PPL at 13. Thus, PPL reverts to a *de facto* field preemption argument.

PPL also disagrees that the City has "concurrent authority" with the PUC over utilities in municipal rights-of-way. While this Court has allowed concurrent regulation where the statute expressly granted some role or prerogative to local authorities, nothing of that sort can be found in the Code. *Id.* at 14-15 (citing and distinguishing *Mars Emergency Med. Servs. v. Twp. of Adams*, 740 A.2d 193 (Pa. 1999) (decided under the Emergency Medical Services Act); *Borough of Monroeville*, 298 A.2d 252 (express statutory grant to designate an underground wiring district preserved but subordinate to PUC determinations on the contours of same); *W. Pa. Rest. Ass'n v. Pittsburgh*, 77 A.2d 616 (Pa. 1951) (decided under a state statute concerning licensure of eating or drinking places)). To the contrary, the legislature vested tremendous regulatory discretion as well as oversight and enforcement authority in the PUC, without offering any affirmative

---

[26] PUC has briefed this case separately and well, but consistently with PPL's arguments. For ease of reference, we refer primarily to PPL's brief.

statutory sources for the concurrent authority the City seeks to exercise such as the distinct underground wiring district statute that informed our decision in *Borough of Monroeville.*

Regarding Section 263B-3's inspection provisions, PPL submits that, as the court found below, the provisions vesting extensive authority in PUC to inspect public utilities and enforce compliance reflect the General Assembly's intent to make PUC the sole inspector of utility facilities. Granting the City parallel authority undermines that intent. PPL disputes the City's attempt to downplay the scope of the Ordinance's authority. PPL asserts that, "[u]nder the Ordinance, City inspectors may climb utility poles, test wires, access transformers, open underground conduits, and enter substations, and may do so for the purpose of determining whether these facilities comply with PUC standards." *Id.* at 38.

With regard to Section 263B-4(6), concerning the temporary or permanent repositioning or removal of public utility facilities, and Section 263D-1, concerning enforcement of PUC standards including imposition of fines where doing so does not conflict with the PUC's exclusive authority, PPL again returns to its impermissible-concurrent-regulation argument. Examining PUC regulations that are responsive to such needs, PPL submits that the regulations address even emergent situations. *Id.* at 41.[27]

Although PPL engages and rebuts the City's conflict preemption analysis, its arguments return ineluctably in substance to field preemption. This is all but inevitable,

---

[27] PPL cites, *inter alia,* 52 Pa. Code § 57.198 ("Inspection and maintenance standards"); *id.* §§ 101.1-101.7 (prescribing public utility preparedness for, *inter alia*, "physical security . . . emergency response and business continuity plans to protect this Commonwealth's infrastructure and ensure safe, continuous and reliable utility service").

because field preemption long has governed utility regulation. *See Phila. Elec.*, 218 A.2d at 333 (holding that "the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities"); *Upper St. Clair*, 105 A.2d at 292 ("[T]he policy of the Commonwealth in entrusting to the [PUC] the regulation and supervision of public utilities has excluded townships from the same field . . . . Unless the legislature has given an *express* grant of power to townships, the Commonwealth's own expressed policy on the subject is undiminished and supreme."). Regardless of whether conflict preemption taken in isolation would lead to a favorable result, preemption writ large is not a buffet from which a local authority may choose the dish it prefers. A winning conflict preemption argument cannot restore what field preemption already precludes. Upon finding that the legislature intended to occupy the regulatory field, we must reject all local regulation fairly encompassed by that field. Consequently, the City's arguments notwithstanding, we need only determine whether Ordinance §§ 263B-3, 263B-4(6), and 263D-1 intrude upon the field that the General Assembly has entrusted to state law and PUC oversight and enforcement. We find that they do.

Section 263B-3 concerns municipal inspections of utility facilities in municipal rights-of-way for purposes of Code compliance. However, for the reasons stated (and the authorities cited) at length above,[28] Code compliance and enforcement plainly are entrusted to the PUC. Because the Code reflects the General Assembly's intent to preempt the field and PUC regulations effectuate that intent, the City lacked authority to step into that domain, even gingerly.

---

[28]     *See supra* at 9-10 & n.15.

Moreover, it would be naïve to imagine that a city possessed of such authority would be empowered to do nothing more than the PUC would do in its shoes, or would do it in the same manner. In granting the City discretion to conduct such inspections and decide how to pursue the abatement of Code violations, the Ordinance confers upon the City tools that might be applied in an overly aggressive or even harassing fashion. In delegating these matters to the PUC, the legislature plainly intended that discretionary decision-making be vested in one regulatory body, in furtherance of uniformity of application. This would be confounded by inviting hundreds of municipalities to create their own patchwork of "supplementary" regulations to enforce at whim. While we have no cause to impute such an ulterior motive to the City, it is precisely with this concern in mind that we observed that "local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, . . . if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference." *Upper St. Clair*, 105 A.2d at 293.[29] Accordingly, we find that the Commonwealth Court correctly held that Section 263B-3 is preempted.

---

[29] In this regard, PUC cogently argues that if the City is allowed to determine for itself whether exercise of the Ordinance's removal and relocation provision is consistent with PUC regulations, it has effectively usurped PUC's original jurisdiction over disputes concerning such matters. *See* Second Brief for PUC at 12-13. We note that this observation also relates to the Ordinance's implicit premise that the City may decide in the first instance *what* lies in PUC's exclusive jurisdiction, itself a consequential determination that leaves the City more discretion than we believe the General Assembly intended.

The City disputes the relevance of such speculation, suggesting that we must focus solely on the Ordinance's language. Reply Brief for the City at 8, 25-26. But it is precisely such language that prompts reasonable concern regarding how any given

The same fate befalls Section 263B-4(6), which authorizes the City to direct utilities to relocate or remove utility facilities. Unlike Section 263B-3, Section 263B-4(6) does not precisely acknowledge the PUC's primacy in this connection, nor suggest that the City's authority extends only to the point where it is inconsistent with the PUC's. Instead, Section 263B-4(6) acknowledges PUC only inasmuch as it indicates that PUC standards shall apply to the manner of relocation or removal—which is not, on its face, the same as providing that relocation or removal will be ordered only where the PUC allows. As evinced by the Code and regulations thereunder, matters pertaining to the location of utility facilities lie within the ambit of the PUC's regulatory authority. Hence, relocation and removal of utility facilities also lie within the preempted field.

Against this backdrop, it is equally clear that Section 263D-1's enforcement authority also is preempted. As noted above, the General Assembly has entrusted enforcement of regulatory compliance to the PUC and delineated the mechanisms the PUC may employ to that end. Consequently, Section 263D-1's grant of authority to the City to impose sanctions for a utility's non-compliance plainly cannot stand.[30]

---

municipality, when allowed to enact similar ordinances, may abuse the privileges it confers upon itself thereby. And we must measure the potential for abuse against what we take to be legislative intent. The risk of abuse of local authority plainly has informed our prior decisions establishing state preemption of the field of utility regulation

[30]    The City contends that deeming this provision preempted will strip it of any enforcement authority for violations of the reasonable regulations imposed pursuant to the undisputed authority to impose permitting requirements and the like conferred by BCL § 1511(e). Reply Brief for the City at 23-24. However, the City fails to establish that the permitting ordinances, themselves, do not provide for such enforcement, and it beggars belief that, until the enactment of Ordinance 16-2013, the City was powerless to enforce compliance with such regulations as Section 1511(e) allows. Relatedly, as PPL observes, see Brief for PPL at 48, a Committee Comment to Section 1511 provides that "[t]he reference in the last sentence of subsection (e) to 'permits' is a codification of the prior law relating to the time and manner of opening a street, etc., and is not intended to

*2.    PPL's appeal* [31]

PPL argues that the Commonwealth Court erred in upholding City's imposition of maintenance fees in Section 263B-5.[32]   Noting the statewide imposition of an annual statewide assessment to support the PUC's regulation, PPL argues that local fees undermine the PUC's regulatory authority.  PPL further argues that the annual fee will be passed on to consumers, an argument that the Commonwealth Court deemed immaterial to the statutory question presented.  *See PPL*, 125 A.3d at 851-52.  The rates that a utility may charge, PPL notes, are subject to PUC approval, and necessarily are affected not

imply a power to decide whether or not, and by whom, a type of utility service may be offered by means of the contemplated facilities."  15 Pa.C.S. § 1511(e) Cmt.

[31]    Support for PPL's positions in this matter is reflected in *Amici Curiae* briefs submitted by Aqua Pennsylvania, Inc., and Pennsylvania Water Co.; The Communications Providers; and the Energy Association of Pennsylvania.

[32]    Section 263B-5 provides, in relevant part:

(1) *Compensation for Right-of-Way Use.*  Occupancy of City Rights-of-Way by any Utility is subject to the City's right to fix annually a fair and reasonable compensation, which shall be directly related to the City's actual Right-of-Way maintenance costs.

(2) *Annual Right-of-Way Maintenance Fee.*  Each Utility with Facilities in the City's Rights-of-Way shall pay an annual fee to compensate the City for its costs incurred in connection with the ongoing use and occupancy of City Rights-of-Way.   The Annual Right-of-Way Maintenance fee shall be determined by the City and authorized by resolution of City Council and shall be based on the City's actual [Right-of-Way] maintenance costs.  The Annual Right-of-Way Maintenance fee shall be fixed on a per-linear foot basis for Underground Facilities and on a per-linear foot basis for Aerial Facilities . . . .

Ordinance 13-2016 §§ 263B-5(1), (2).

only by staffing and facility costs, but also by the cost of regulatory compliance, which will escalate if utilities must answer to local authorities as well as the PUC.[33]

PPL disputes the Commonwealth Court's conclusion that the maintenance fee does not constitute local utility regulation but rather lies within the traditional municipal police power as immaterial to the question of preemption: Thus, even if the City generally may impose fees for the maintenance of its rights-of-way, its power must yield if it conflicts with areas of predominant state regulation. Here, because the legislature clearly has considered and provided for cost-sharing of the expenses associated with the PUC's compliance monitoring and enforcement, its omission of any provision granting authority to municipalities to impose parallel cost-sharing obligations strongly implies that it did not intend to grant such authority.

In *Borough of Monroeville*, PPL observes, the borough had enacted its ordinance directing relocation of transmission lines underground pursuant to the Borough Code, which then conferred power upon boroughs to "define, by ordinance, a reasonable district within which electric light, electric power, telephone, telegraph wires and other types of wires shall be placed underground in conduits." *See Borough of Monroeville*, 298 A.2d at 254-55 (quoting 53 P.S. § 47301 (repealed)). This Court construed this power as comparable to the PUC's within the applicable domain. We thus endeavored to give each of them effect, and concluded that, while a borough was free to define such a district, the

_____

[33] PPL notes that, in a concurring opinion in *Borough of Monroeville*, Justice Roberts opined that, in imposing a costly relocation of existing wires underground, the municipality would impose a burden upon all consumers because the cost would be spread to the utility's entire customer base in the form of increased rates, not just to customers located in the municipality. *See* 298 A.2d at 258 (Roberts, J., concurring). Such would be the case if the City's maintenance fee—and, eventually, any similar fee imposed by any other municipality—is upheld.

PUC nonetheless had ultimate authority to "determine the particulars of implementation, including timing, feasibility and cost of the project." *Id.* at 256. PPL submits that the City's case in this matter is much weaker, because the City lacks even the support of a statute suggesting some degree of overlapping authority, the likes of which has always existed where this Court recognized any local regulatory authority whatsoever—which even in such instances, was always deemed subordinate to state regulatory provisions.

Necessarily, then, PPL rejects the argument that BCL § 1511(e), in requiring utilities' conformance to "lawful and reasonable" local regulations, constitutes express statutory authority comparable to the preemption-defying statute at issue in *Borough of Monroeville*. Rather, recognizing that the local regulations caveat must have some application, PPL suggests that Section 1511(e) applies to nothing more than permitting and related matters associated with *entry* into rights-of-way, including reasonable fees associated with these concerns—which the City imposes and to which PPL raises no objection. Section 1511(e)'s scope does not, however, reach so far as to authorize continuing maintenance fees, which far exceed the requirement that *entry* into rights of way may be conditioned upon permits and reasonable regulations.[34]

The City essentially relies upon the Commonwealth Court's reasoning, maintaining that the imposition of occupancy fees to recover reasonable costs is a function of its home-rule authority, and that such cost-recovery is supported by case law holding that right-of-way maintenance is a proper, and indeed constructively obligatory, exercise of municipal police powers. *See* Brief for the City at 19 (citing *Adams*, 55 A.2d 392; *Am.*

---

[34] Notably, Section 1511(e) does not expressly authorize any fees at all, although PPL does not dispute the City's authority to impose reasonable fees associated with the permitting process.

*Nat. Gas*, 86 A. 717).  The City stresses that none of the legal authorities cited by PPL and PUC or their *amici* addresses or precludes the imposition of such fees.  Rather, those cases find preemption in other, inapposite contexts.  In *American National Gas*, the City notes, this Court upheld a municipal licensing fee imposed upon utility companies on a per-mile basis, holding that the municipality could recover costs specifically associated with exercising its police power in connection with the utility rights-of-way.

First, we can quickly dispense of the lower court's and the City's reliance upon *Adams* and *American National Gas.  Adams* involved a municipal ordinance imposing a license and fee requirement, which was upheld as a valid exercise of the municipality's police powers.  However, it did not involve any competing state law regulatory regime or licensure requirement, and did not present any question of preemption.  While we upheld a per-mile maintenance charge in *American National Gas*, at that time there was no competing state regulatory framework to which utilities were beholden.  Indeed, the first utility code we examined for preemptive effect was enacted that year, and our first preemption finding came two years later, in our 1915 *York Water* decision.  When we decided *American National Gas*, there was no legacy of case law applying field preemption to local attempts to impose regulations on public utilities.  Accordingly, neither of these cases can bear the weight the City asks them to carry.

Unlike the Commonwealth Court, we find some persuasive weight in PPL's suggestion that local maintenance fees will be passed on to consumers, and not only those consumers in the municipality who benefit, ostensibly, from the utilities' use of the rights-of-way, but also those in other municipalities.[35]  Moreover, by allowing local

---

[35]  PUC endorses PPL's argument in this regard.  *See* Brief for PUC at 35-37.

government, backstopped by the Court of Common Pleas, to determine the reasonableness of the City's maintenance fees, we again run into concerns regarding local authorities' competing motives, as well as inconsistencies across jurisdictions, where the burden of maintenance fees, and what fees are reasonable, may vary considerably. Assuming the PUC approves a utility's proposed rate that reflects local maintenance fees, thereby passing the expense on to that utility's entire subscriber base, the effect will be that subscribers in more frugal or less complex jurisdictions will bear not only the expense associated with their own service area, but also will subsidize the expenses of other municipalities in which the maintenance costs are greater. This flies in the face of the preference for the fairness and relative simplicity of providing a uniform regulatory framework that ensures a level playing field for all utilities and utility subscribers.

Like the state-level tariff, the City proposes to impose a fee that, at least in part, reflects the regulatory expense of overseeing utilities' conduct within its jurisdiction. This would be doubly the case were we to uphold the Ordinance's proposed inspection and enforcement provisions—and it is only right to view the City's intent relative to the entirety of the Ordinance it enacted. However, these costs are materially congruent to the state-level costs embedded in the state tariff that utilities already bear. Thus, if the tariff is a utility regulation, and plainly it is, one cannot tenably maintain that a municipal maintenance fee can be understood as anything but the same. Consequently, the maintenance fee, too, is preempted by the Code in favor of the PUC's authority to regulate public utilities. The Commonwealth Court erred in ruling otherwise.

### III. Conclusion

In *Philadelphia Electric*, this Court held that "[o]ne would search in vain through the County Code for any provision authorizing counties to control the actions of public utilities . . . . The State, speaking through the Public Utility Law [of 1937] . . . has given the [PUC] all-embracive regulatory jurisdiction over companies such as the defendant company in this case." *Phila. Elec.*, 218 A.2d at 332. The *Philadelphia Electric* Court further observed that "jurisdiction in matters concerning the relationship between public utilities and the public" lies in the PUC, encompassing "rates, service, rules of service, extension and expansion, hazard to public safety due to use of utility facilities, installation of utility facilities, [and, *inter alia*,] location of utility facilities." *Id.* at 332-33 (quoting *Borough of Lansdale*, 170 A.2d at 567; emphasis omitted)). To avoid the harm that would follow from convolution of fragmentary local regulation of public utilities, the General Assembly "vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utility facilities." *Id.* at 333.

For the foregoing reasons, we hold that all of the provisions of Ordinance 16-2013 at issue in this case are preempted by the Public Utility Code. Accordingly, the Commonwealth Court's ruling is affirmed to the extent that it found Ordinance 16-2013's provisions preempted, and is reversed insofar as the court upheld the City's imposition of an annual maintenance fee upon utilities utilizing the City's rights-of-way.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.